**CHEMICAL BANK,**
Plaintiff,

v.

**WORLD HOCKEY ASSOCIATION**
et al., Defendants.

No. 74 Civ. 1433.

United States District Court,
S. D. New York.

Nov. 4, 1975.

Richard S. Toder, Zalkin, Rodin & Goodman, New York City, for plaintiff.

Everett A. Eisenberg, Graubard Moskovitz McGoldrick Dannett & Horowitz, New York City, for defendants.

## OPINION

GRIESA, District Judge.

Defendants Schwartz and Professional Sports Enterprises, Inc. move to dismiss the action for lack of personal jurisdiction over them. The motion is granted.

## I.

Plaintiff Chemical Bank's claim in this action is that defendants have interfered with its security interest in a hockey franchise held by a team known as the "Golden Blades". Defendant World Hockey Association ("WHA") is the franchisor. Defendants Schwartz and Professional Sports are alleged to have participated with WHA in depriving plaintiff of its rights in the Golden

Blades hockey franchise. Subject matter jurisdiction is based upon diversity of citizenship.

Both Schwartz and Professional Sports are located in Maryland and were served in Maryland. Plaintiff's claim of personal jurisdiction over Schwartz and Professional Sports is made solely under the New York "long arm" statute—specifically C.P.L.R. §§ 302(a)(1) and 302(a)(3)(ii).

The present motion of Schwartz and Professional Sports is submitted to the Court on the basis of extensive discovery. Plaintiff has failed to make the necessary showing to sustain jurisdiction over Schwartz and Professional Sports.

## II.

The complaint alleges that in April 1973 WHA entered into an agreement with certain persons to grant these persons a WHA franchise in New York for the operation of a team shortly thereafter known as the Golden Blades. The complaint alleges that this agreement was closed in May 1973 and that at this time plaintiff loaned to the Golden Blades $500,000.00 secured by a pledge and assignment of the franchise. It is alleged that in October 1973 WHA purported to terminate the franchise of the Golden Blades and to move the Golden Blades hockey team to Cherry Hill, New Jersey where it operated under the name of the Jersey Knights. It is alleged that in January 1974, while the $500,000.00 debt to plaintiff remained unpaid, and while the plaintiff's lien on the franchise was in full force and effect, WHA purported to transfer and reissue the franchise, free of plaintiff's lien, to Schwartz and Professional Sports, who thereafter operated the team as the Jersey Knights in Cherry Hill, New Jersey. The complaint alleges that Schwartz and Professional Sports knew, or should have known, of the existence of plaintiff's lien.

There are five claims alleged in the complaint. The first of these is a claim that the acts of Schwartz, Professional Sports and WHA constituted a wrongful appropriation and conversion of the collateral upon which plaintiff held a lien; the second is against WHA only and alleges fraud; another "second" claim is against all defendants to impose a lien; the third is against all defendants for an accounting of money paid by Schwartz or Professional Sports to WHA; the fourth is against Schwartz and Professional Sports for wrongful interference with the performance of WHA's agreements with plaintiff; the fifth is against WHA only and is a claim for unjust enrichment.

## III.

Certain of the allegations of the complaint appear to be factually correct, as indicated by the discovery. A WHA franchise for the Golden Blades in New York was set up, and plaintiff did loan $500,000.00 to the Golden Blades secured by the franchise. This loan was made in May 1973.

Plaintiff relies strongly on certain trips made by Schwartz to New York City, as providing a jurisdictional nexus. For reasons hereafter described, I cannot accept this contention.

It appears that the first of these trips to New York City was in May 1973. Schwartz spoke to representatives of WHA on the subject of obtaining a hockey franchise for Baltimore. Apparently there were no affirmative indications by the WHA people. Schwartz testified in his deposition that he was merely told that WHA would take the matter up.

Schwartz made another trip to New York City, probably in June 1973, and had discussions with the principals of the Golden Blades—Matison and Brent. There are somewhat conflicting versions about what occurred at this meeting. According to Schwartz's deposition, the June 1973 meeting related solely to the possible acquisition of a new WHA franchise for Baltimore, and he was talking to Matison solely in the context of Matison being a trustee of WHA.

According to Schwartz, Matison said that the matter of a Baltimore franchise would be taken up at the forthcoming meeting of the WHA trustees in Vancouver, British Columbia. Schwartz testified that about two weeks after the meeting Matison called him from Vancouver and said that a franchise for Baltimore could be obtained for $2 million. Schwartz informed Matison that the matter would be taken under consideration. Schwartz testified that he could not recall any further discussions relating to the purchase of a hockey team or franchise until November 1973.

Matison and Brent offer a different description of the June 1973 meeting. They have submitted affidavits to the effect that Schwartz said that he was interested in acquiring a WHA franchise for Baltimore; that Matison told Schwartz that WHA was not currently selling franchises but that Schwartz should consider acquiring an interest in the Golden Blades in order to gain expertise in hockey operations prior to seeking his own franchise for Baltimore; and that Schwartz replied that he would consider the matter.

According to Matison, Schwartz made another trip to New York in July 1973, at which time there was a two-hour meeting primarily devoted to a discussion of Schwartz's possible acquisition of the Golden Blades. The price of $2 million was discussed. Matison's version is that at the close of this meeting Schwartz promised to get back to Matison with regard to the proposal. Matison recalls subsequent telephone conversations with Schwartz culminating in a statement by Schwartz in one of these telephone conversations in August or September to the effect that Schwartz was not interested in acquiring the Golden Blades.

For the purposes of the jurisdictional question, it is not necessary to determine which version of these conversations is the correct one. Whether we view the discussions as relating to a possible purchase by Schwartz of the Golden Blades, or a possible purchase of an entirely new franchise, the important point is that these discussions during Schwartz's trips to New York in the late spring and early summer were casual and insubstantial. There were no actual negotiations of any contract terms. In fact, the results of these discussions were negative. It was not until many months later that an entirely new set of discussions, between Schwartz and a new president of WHA, led to negotiations for the contract which is the subject of this action. These negotiations will be described hereafter.

To return to the story of the Golden Blades, financial problems made it impossible for that team to commence the 1973–74 hockey season starting in October 1973. In the middle of that month, WHA terminated the franchise of the Golden Blades and assumed the management of that team. WHA moved the team to Cherry Hill, New Jersey to be operated under a new WHA franchise known as the Jersey Knights. The Knights took over the original Golden Blades schedule for the 1973–74 season and played out the season.

According to the testimony of Schwartz, a newspaper reporter telephoned him in November 1973 to tell him about the move of the Golden Blades to New Jersey. The reporter asked Schwartz if he would be interested in having a hockey team in Baltimore. This apparently led to telephone conversations by Schwartz's associate, Feldman, with a Mr. Browitt of WHA regarding a possible WHA franchise in Baltimore. Browitt said that WHA was not interested.

Schwartz testified that in late November 1973 Dennis Murphy, who resided in California, became president of WHA. Murphy then telephoned Schwartz and proposed that Schwartz acquire the Jersey Knights. Schwartz said at this time that he was not interested in a "defunct" team. In the middle of December Murphy again called Schwartz and urged Schwartz to consider acquiring

the Knights' franchise and moving the franchise to Baltimore the following year, rather than acquiring a new franchise. Subsequently Murphy and Schwartz met in Baltimore to discuss this transaction. Schwartz asked Murphy to send him information on the operating cost and budget of the Jersey Knights and Schwartz went to see the Knights play in Cherry Hill, New Jersey. During one of the breaks between periods Schwartz met with the general manager, a Mr. Milkes, of the team who said he was preparing the figures for Schwartz. A few days later Schwartz received the figures either from Milkes or over the phone from Murphy and became interested in acquiring the Knights' franchise. Sometime around December 21, 1973 Schwartz began negotiating with Murphy over the telephone in many separate conversations. A form of agreement was arrived at shortly after Christmas and Murphy agreed to come East to finalize the deal. Murphy came to Baltimore on December 29 and on the 30th there was an all-day negotiating session which culminated in a written agreement. The agreement provided that Professional Sports, a company set up by Schwartz, would undertake the completion of the 1973–74 hockey season of the Knights, and would thereafter operate a WHA franchise in Baltimore.[1]

It appears from Murphy's deposition that his negotiations with Schwartz may have included two meetings in addition to those testified to by Schwartz.

In any event, all meetings relating to the discussions and negotiations between Schwartz and Murphy beginning in November 1973 took place in Maryland. In addition, the telephone conversations were between Maryland and California.

## IV.

■ In order to sustain jurisdiction under C.P.L.R. § 302(a)(1), plaintiff must show that Schwartz and Professional Sports transacted business within New York and that the cause of action arises from the business thus transacted. *Fontanetta v. American Board of Internal Medicine*, 421 F.2d 355, 357–58 (2d Cir. 1970); *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). In *Sterling Nat'l Bank & Trust of New York v. Fidelity Mortgage Investors*, 510 F.2d 870, 873 (2d Cir. 1975), the Court of Appeals provided guidance applicable to a case such as the present one, stating that the proper inquiry is whether "purposeful acts have been performed in New York by the foreign corporation in relation to the contract". These acts must be of sufficient substance to indicate that the defendant has availed himself of the privilege of conducting business activities within the state, thus invoking the benefit and protection of New York law. *Liquid Carriers Corp. v. American Marine Corp.*, 375 F.2d 951, 955–56 (2d Cir. 1967); *Longines-Wittnauer Watch Co. v. Barnes Reinecke, Inc.*, 15 N.Y.2d 443, 458, 261 N.Y.S.2d 8, 19; 209 N.E. 2d 68, 75, *cert. denied*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965).

■ If there is a cause of action against Schwartz and Professional Sports, it could arise only from the December 1973 agreement. But this agreement was not entered into in New York, nor did the negotiations leading up to this agreement take place in New York. Indeed the only activities of either of these defendants in New York in any way connected with this case were the discussions participated in by Schwartz in May-July 1973. However, these discussions were not really part of the negotiations leading up to the December 1973 agreement. Regardless of whether we accept the Schwartz version or the

1. It appears that the team purchased by Schwartz and Professional Sports was never actually located in Baltimore. After completing the 1973–74 season in New Jersey, the franchise eventually ended up in San Diego.

Matison-Brent version of the May-July 1973 discussions, it is clear that they were exploratory and inconclusive, and did not in any realistic sense constitute the transacting of business giving rise to the alleged cause of action.

It is clear that substantial negotiations in New York leading up to the making of a contract, even though the contract is signed in another state, can be the basis for jurisdiction in New York under C.P.L.R. § 302(a)(1). *Liquid Carriers Corp. v. Marine Carriers Corp.*, *supra* at 956; *see Galgay v. Bulletin Company, Inc.*, 504 F.2d 1062, 1065–66 (2d Cir. 1974). However, I am aware of no case which has sustained jurisdiction under § 302(a)(1) where the non-resident defendant's presence in New York relates solely to conversations which are not part of the negotiations leading to the contract in question. *See Mattgo Enterprises, Inc. v. Aaron*, 374 F.Supp. 20, 23 (S.D.N.Y.1974); *McKee Electric Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 37–38, 229 N.E.2d 604, 607 (1967).

■ Plaintiff suggests that there may have been a conspiracy between Schwartz and WHA to impair plaintiff's security interest (Chemical Bank's Memorandum of Law in Opposition to Motion, p. 12). Under certain circumstances the acts of a co-conspirator within New York can give rise to jurisdiction over another co-conspirator in another state. *American Broadcasting Co. v. Hernreich*, 40 A.D.2d 800, 338 N.Y.S.2d 146 (1st Dept. 1972). However, plaintiff has not really attempted to demonstrate, or show any factual basis to prove, conspiratorial acts by WHA in New York sufficient to give rise to jurisdiction over Schwartz and Professional Sports. *Baldridge v. McPike, Inc.*, 466 F.2d 65, 68 (10 Cir. 1972) ("Mere allegation of conspiracy, without some sort of prima facie factual showing of a conspiracy, cannot be the basis of personal jurisdiction of co-conspirators outside the territorial limits of the court."), citing *H. L. Moore Drug Exchange, Inc.*

*v. Smith Kline & French Laboratories*, 384 F.2d 97, 98 (2d Cir. 1967) (". . . the presence of one co-conspirator within the jurisdiction does not give jurisdiction over all who are alleged to be co-conspirators."); *Socialist Workers Party v. Attorney General of the United States*, 375 F.Supp. 318, 322 (S.D.N.Y.1974).

V.

Plaintiff also seeks to assert jurisdiction over Schwartz and professional Sports under C.P.L.R. § 302(a)(3)(ii). This section of the statute provides for jurisdiction based on a tortious act outside the state "causing injury to person or property within the state", where the defendant "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."

I hold that, under the controlling decisions, there is a failure in this case to show the requisite "injury to person or property within the state."

As described earlier, there are two causes of action in the complaint against Schwartz and Professional Sports sounding in tort. One is for an alleged wrongful conversion of collateral. The other is for an alleged wrongful interference with the performance of WHA's agreements with plaintiff.

■ The trouble with attempting to apply this statutory provision in a commercial case such as the present one is that the provision was not really designed to cover cases of this kind. As the Second Circuit Court of Appeals has noted, this statutory provision was enacted in response to a New York Court of Appeals ruling which had denied personal jurisdiction over an out-of-state defendant where that defendant shipped a propane gas tank into this state, after which the tank exploded causing injury. *See American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 432–33 n.4 (2d Cir. 1971).

■■ The courts have had some difficulty in applying C.P.L.R. § 302(a)(3)(ii) to non-physical commercial injuries. However, the cases which have dealt with the problem appear to have laid down the following basic rules. *First*, the residence or principal place of business of the plaintiff will not necessarily be deemed to be the place of the "injury"—*i.e.*, the injury will not necessarily be considered to take place at the residence or principal place of business of the plaintiff simply because the plaintiff experiences an economic effect of the wrongful activity at that place. *Second*, in a commercial tort situation the place of the injury will usually be deemed to be the place where "the critical events associated with the dispute took place". See *American Eutectic, supra* at 433–35, citing with approval *Spectacular Promotions, Inc. v. Radio Station WING*, 272 F.Supp. 734, 737 (E.D.N.Y.1967). Moreover, in connection with the tort of conversion the injury must be deemed to occur in the place where the defendant's acts respecting the property are committed. *Friedr. Zoellner (New York) Corp. v. Tex Metals. Co.*, 396 F.2d 300, 303 (2d Cir. 1968); McLaughlin, *Practice Commentary*, C.P.L.R. § 302, 7B McKinney's Consolidated Laws 87 (1972).

■ Applying these authorities in the present case, it is apparent that there is no basis for jurisdiction under C.P.L.R. § 302(a)(3)(ii) over Schwartz or Professional Sports. If Schwartz or Professional Sports committed any acts amounting to a conversion of the franchise in derogation of plaintiff's security interest, or if these defendants committed any acts causing WHA to breach its agreements with plaintiff, such acts were committed in Maryland or possibly in New Jersey. These acts consisted of negotiating and signing the December 1973 contract in Maryland, and also perhaps consisted of operating the Knights team in New Jersey. In other words, the real injury here, if there was any, consisted of the crucial dealings by Schwartz and Professional Sports with WHA. And these dealings took place in Maryland, and possibly in New Jersey —but not in New York.

It should be noted that, according to the complaint, WHA is a Delaware corporation with its principal place of business in California. Schwartz's negotiations leading up to the December 1973 contract were with WHA's president, Murphy, who was a resident of California.

Under all the circumstances, the "injury" here must be deemed to have occurred outside of New York. Under the applicable cases, the mere fact that, due to plaintiff's being located in New York, it experienced financial consequences here, is not sufficient basis for jurisdiction under the relevant statutory provision.

■ Two specific arguments of plaintiff should be further discussed. Plaintiff seeks to attach significance to the fact that its security interest was filed in New York. Plaintiff also contends that Schwartz and Professional Sports undoubtedly knew of the potential damage to plaintiff in New York, since, in connection with the December 1973 agreement, Schwartz obtained an indemnity agreement from WHA covering possible liability to plaintiff.

Regarding the first point, the lien was undoubtedly filed in New York at the time of the loan to the Golden Blades, then located in New York. But this filing in New York is of little significance in determining where an "injury" takes place at a later time involving a purchase negotiated in Baltimore of assets then located in New Jersey.

■ I also conclude that the argument about Schwartz's knowledge of potential damage to Chemical Bank is ineffectual. The Second Circuit Court of Appeals has held that the foreseeability of economic consequences is something separate and distinct from the question of where the tortious injury took place. *American Eutectic, supra* 439 F.2d at

434–35. The question of the place of injury for the purpose of C.P.L.R. § 302 (a)(3)(ii) must be decided on the basis of the considerations described earlier in this opinion.

### Conclusion

The motion of defendants Schwartz and Professional Sports Enterprises, Inc. to dismiss for lack of personal jurisdiction is granted.

So ordered.