**CHINA UNION LINES, LIMITED, and International Union Maritime Insurance Company Limited, Plaintiffs,**

v.

**AMERICAN MARINE UNDERWRITERS, INC., and Calvert Fire Insurance Co., Defendants and Third-Party Plaintiffs.**

**CANADIAN MARINE UNDERWRITERS LIMITED and CNA Assurance Company, Defendants,**

v.

**I. R. POSGATE and Other Underwriters at Lloyd's Subscribing to Reinsurance Contract "GLH No. 1039–61", Third-Party Defendants.**

No. 76 Civ. 3052.

United States District Court,
S. D. New York.

June 23, 1978.

---

12. *Id.* at A25–26.

13. *Id.* at A27.

Hughes, Hubbard & Reed, New York City, for plaintiffs.

Bigham Englar Jones & Houston, New York City, for defendants.

Mendes & Mount, New York City, for third-party defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

Canadian Marine Underwriters Ltd. ("Canadian") and CNA Assurance Company Inc. ("the moving defendants"), seek an order dismissing plaintiffs' complaint on the grounds (1) that this court does not have personal jurisdiction over them; and (2) that service of process was improper and therefore void.

Plaintiff China Union Lines, Limited ("China Union"), a Republic of China corporation, claims that the defendants have failed to honor an insurance policy covering a China Union Line vessel that was lost in a typhoon. Plaintiffs predicate subject matter jurisdiction in this district upon diversity of citizenship, 28 U.S.C. § 1332, and alternatively upon the admiralty jurisdiction provisions of 28 U.S.C. § 1333. The moving defendants do not contest the existence of subject matter jurisdiction.

For the reasons set forth below, I find that the defendants have transacted business in New York within the meaning of N.Y. CPLR § 302(a)(1) and are therefore subject to the jurisdiction of this court; and that they have been duly served with process. I deny the motion to dismiss.

Plaintiffs have the burden of showing that personal jurisdiction exists. However, it is proper to rely on affidavits to establish jurisdictional facts, *Lynn v. Co-*

hen, 359 F.Supp. 565, 566 (S.D.N.Y.1973), and as the non-moving parties, plaintiffs are entitled to consideration of their pleadings and affidavits in the light most favorable to them. *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191, 192–93 (E.D.Pa.1974); *Freeman v. Gordon & Breach Science Publishers, Inc.*, 398 F.Supp. 519, 520 (S.D.N.Y.1975).

I find, for purposes of disposition of this motion, that the following facts are not in dispute.

In late 1974, China Union negotiated a new insurance plan with C. E. Heath, Ltd. ("Heath"), its London insurance broker. Heath contacted Alexander & Alexander ("Alexander"), New York insurance brokers, seeking to place part of the insurance through them.[1] Alexander placed 10 percent of the insurance with Calvert Fire Insurance Co. ("Calvert") through its agent American Marine Underwriters, Inc. ("American").[2] Alexander later placed another 5 percent with CNA through its agent, Canadian.[3] Both CNA and Canadian are Canadian corporations based principally in Toronto, Ontario. Neither CNA nor Canadian has any offices in New York.

The negotiations leading to the placement of the insurance with CNA began on January 13, 1975, when Charles H. Nutter, assistant vice president of Alexander, telephoned from New York to Peter P. Smith, executive vice president of Canadian, who was in Toronto. Nutter's call was prompted by suggestions from Joseph Fogarty, chairman of American, who encouraged Nutter to place a part of the China Union insurance with Canadian. At the time American owned some 49 percent of Canadian's stock. Nutter told Smith that American had agreed to cover a portion of the risk, and Smith orally agreed to take 5 percent for Canadian and CNA.[4]

On January 28, 1975, Nutter forwarded a written binder agreement to Smith. The binder purported to memorialize the earlier oral agreement, and is dated "New York, N.Y., January 28, 1975." Taro Asnani, vice president of Canadian in charge of underwriting activities, signed the binder on behalf of CNA and Canadian and returned it by mail to Alexander in New York. According to the binder agreement itself, and in accordance with custom and practice in the insurance business, Canadian and CNA were to send the broker's commission and any payments which became due under the policy in satisfaction of claims to Alexander in New York.

Three weeks after the binder was signed, the Union East, a China Union Line vessel, foundered in a typhoon near New Zealand. China Union claimed that the ship, a total

---

1. Mr. Nutter describes Alexander's activities as follows:

    The duties of [Alexander] as insurance brokers included servicing the China Union Lines account, as well as placing the insurance. In the four months following the signing of the binder, I and others from [Alexander] served as a liaison between defendants and C. E. Heath, plaintiffs' London broker. In that capacity, I and others from [Alexander] answered inquiries from the defendants, referred certain of the defendants' inquiries to C. E. Heath, relayed C. E. Heath's responses to defendants, assembled the necessary documentation relating to the total loss of the "Union East", presented that documentation to the defendants, collected premiums from C. E. Heath, paid those premiums to defendants, attempted to collect the amount owed by defendants as a result of the total loss, and attempted to collect the commissions owed to [Alexander] by defendants.

2. Calvert Fire Insurance Co. and American Marine Underwriters Inc. are both defendants in this action. Neither is involved in the instant motion.

3. The moving defendants apparently take the position that they never bound themselves to the policy in question. I need not decide the issue of their liability for purposes of deciding this motion and I intimate no opinion on that subject.

4. Three days later, Taro Asnani, vice president of Canadian in charge of underwriting activities, lunched with Mr. Nutter in New York. According to his affidavit, Asnani's two-day visit was unrelated to the CNA–China Union deal and appears to have been undertaken chiefly to solicit business from various New York brokers, including Alexander. Asnani Affidavit at 2–3 (March 23, 1977). There is no indication that the China Union account was discussed during Asnani's visit.

loss, was covered by the January 28th binder. Canadian and CNA disclaimed liability.

From late January through April, 1975, Nutter was in fairly constant telephonic and written communication with Asnani and Smith, first arranging for the execution of the insurance binder and later attempting to obtain satisfaction of the claim.[5] Thus all of these communications related to the alleged contract either in the negotiation stage or in the abortive performance stage. When it became clear that the moving defendants did not consider themselves bound, plaintiffs commenced this suit, against the moving defendants and against American and Calvert.

Thereafter Canadian and CNA commenced an action against Alexander, Heath, and the plaintiffs in the Supreme Court of Ontario. There they seek $50,000 for breach of contract, $50,000 in punitive damages, and a declaration that the insurance binder at issue is void. On July 26, 1977, the Supreme Court of Ontario stayed all proceedings in its court pending determination of the instant motion.[6]

■ The amenability of a foreign corporation to suit must be determined by reference to the law of the forum state. *Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir. 1963). N.Y. CPLR § 302(a)(1) gives the court jurisdiction over any entity that transacts business in New York or that does so "through an agent", with respect to any cause of action "arising from" the business transacted.

■ Accordingly, I must determine whether Canadian and CNA have in fact transacted business in New York and whether the cause of action alleged arises from the business transacted. *See Fontanetta v. American Board of Internal Medi-*

---

5. Nutter's affidavit lists these communications as follows:

   a. telex from Asnani to Nutter, 1/31/75, requesting a schedule of vessels;

   b. letter from Nutter to Smith, 2/5/75, enclosing the schedule requested by Asnani;

   c. telephone call from Nutter to Smith, 2/28/75, relating a request from C. E. Heath that the premiums due [Canadian] be deducted from the amount owed by [Canadian] as a result of the total loss of the "Union East";

   d. letter from Nutter to Smith, 3/7/75, concerning [a] claim/premium offset . . . and clarifying the terms of the placement;

   e. telephone call from Smith to Nutter, 3/31/75, advising Nutter that [Canadian] considered the China Union Lines agreement to be null and void;

   f. letter from Leo Walsh of the Adjusting Department of [Alexander] to [Canadian] 4/7/75, forwarding documentation relating to the total loss of the "Union East";

   g. letter from Smith to Nutter, 4/8/75, purporting to void [Canadian's] participation in the China Union Lines insurance;

   h. letter from Nutter to Smith, 4/8/75, repudiating Smith's letter referred to in paragraph [f] above;

   i. letter from Smith to Nutter, 4/14/75, reiterating [Canadian's] position with respect to its participation in the China Union Lines insurance;

   j. several additional written communications between [Canadian] and Mr. Walsh concerning the total loss collection;

   k. statement and check sent by [Alexander] to [Canadian], on or about April 15, 1976, transmitting funds which included the premium owed to [Canadian];

   l. communication from [Canadian] to [Alexander] on or about April 30, 1976, returning the funds referred to in paragraph [k] above.

6. In staying the Canadian proceedings, Justice Weatherston, of the Supreme Court of Ontario, made the following perceptive observations from the bench:

In this case, the present plaintiffs took part in what was a very international commercial transaction. The insured shipping company was registered in Taiwan; the principal insurers were in the United Kingdom; one insurance company was in New York, and only 5 per cent of the total risk was borne by the plaintiff CNA Assurance Company, Inc., here in Toronto. It seems to me that when the plaintiff has picked New York of all the three common-law jurisdictions available to it, when there does not seem to be any dispute at this time in connection with the 85 per cent of the risk carried through the United Kingdom brokers, when the New York company has 10 per cent of the risk and the Ontario company has 5 per cent, that the Ontario company ought not to complain too bitterly that its dispute of the plaintiffs' claim should be dealt with in the courts of the State of New York rather than here in Ontario. It accepted the insurance risk through New York brokers. In a sense, it did its business in New York and, I think, that we ought not to take a parochial attitude and say that this plaintiff has an absolute right to be tried by those superior courts which exist in this province.

*cine,* 421 F.2d 355, 357–58 (2d Cir. 1970); *Frummer v. Hilton Hotels Int'l., Inc.,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). The proper inquiry in a case such as this is "whether, looking at 'the totality of the defendant's activities within the forum,' purposeful acts have been performed in New York by the foreign corporation in relation to the contract, 'albeit preliminary or subsequent to its execution.' " *Galgay v. Bulletin Co., Inc.,* 504 F.2d 1062, 1064 (2d Cir. 1974), *quoting Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 457 and n.5, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), *cert. denied* sub nom. *Estwing Manufacturing Co., Inc. v. Singer,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1966).[7]

■ The facts of this case indicate that Canadian represented CNA in all of the dealings in question. The defendants readily admit that "CMU [Canadian] is and was an agent of CNA." Since the agent and the principal were united in the same transaction, a finding of jurisdiction over Canadian will compel a finding of jurisdiction over CNA.

■ In the aggregate, the moving defendants engaged in extensive purposeful activity in New York. Their letters, telephone calls and telex messages with respect to the CNA–China Union matter were directed solely to New York. The transaction was negotiated with a New York-based broker. The moving defendants looked to reap substantial sums in premium payments— payments that they arranged to have mailed to them from Alexander in New York. And they agreed to channel into New York all payments which they might be required to make.

The fact that the binder required that all payments be paid into or funnelled through New York is significant. In *Sterling National Bank and Trust Company v. Fidelity Mortgage Investors,* 510 F.2d 870 (2d Cir. 1975), the Court predicated Section 302 jur-

isdiction upon the fact that a disputed debt instrument, "although prepared and executed . . . in Florida, was expressly made payable in New York." 510 F.2d at 873.

Physical presence within the state is no longer a *sine qua non* to a finding of personal jurisdiction:

It is important to emphasize that one need not be physically present in order to be subject to the jurisdiction of our courts under CPLR 302 for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in the State. (See *International Shoe Co. v. Washington,* 326 U.S. 310, 316–17, 66 S.Ct. 154, 90 L.Ed. 95 [(1945)] . . . ; *Lewin v. Bock Laundry Mach. Co.,* 16 N.Y.2d 1070, 266 N.Y.S.2d 391, 213 N.E.2d 686 [(1965)] . . . *[G.] Benedict Corp. v. Epstein,* 47 Misc.2d 316, 262 N.Y.S.2d 726 . . . [(S.Ct. Albany Co. 1965)]). Any implication, in older cases, that physical presence was a necessary factor in obtaining jurisdiction over nonresidents was expressly rejected by the Supreme Court in the *International Shoe* case—the case which provided the constitutional authority for CPLR 302—where the court wrote (326 U.S., at pp. 316–317, 66 S.Ct. 154 . . ): "The terms 'present' and 'presence' are used merely to symbolize those activities * * * which courts will deem to be sufficient to satisfy the demands of due process."

*Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 508 (1970). In *Parke-Bernet* the defendant submitted his bids by telephone from California to an auction taking place in New York. An employee of the auctioneer telephonically apprised defendant of the bidding and relayed defendant's bids to the auctioneer. Judge Fuld found that the defendant had transacted business in New York within the meaning of N.Y. CPLR § 302(a)(1). The unanimous decision was based on alternative grounds. On the

---

**7.** Quoted with approval in *Sterling National Bank and Trust Co. of New York v. Fidelity* *Mortgage Investors,* 510 F.2d 870, 873 (2d Cir. 1975).

one hand, defendant had himself transacted business in New York by means of his frequent phone calls to the auctioneer in New York. Alternatively, defendant was present in the state "through an agent"— the auctioneer's employee was a borrowed servant under defendant's control. In the instant case, I need not consider whether Alexander acted as agent for the defendants. The activities of the moving defendants themselves are sufficient to satisfy the § 302 requirements as interpreted by the *Parke-Bernet* court.

Under these circumstances, I find the moving defendants have invoked the benefit and protection of the laws of New York by availing themselves of the privilege of transacting, within the state, business from which the cause of action alleged arose. Accordingly, they are properly subject to jurisdiction. *Liquid Carriers Corp. v. American Marine Corp.,* 375 F.2d 951, 955–56 (2d Cir. 1967).

Defendants insist that *Chemical Bank v. World Hockey Association,* 403 F.Supp. 1374 (S.D.N.Y.1975) compels a contrary result. In *Chemical Bank* the court held that N.Y. CPLR § 302(a)(1) did not confer jurisdiction over the defendant solely on the basis of a series of tentative, inconclusive and unfruitful negotiations held in New York. However, the *Chemical Bank* negotiations were held to be insubstantial and unrelated to the controversy in question. Defendant therein may have been transacting business in New York at the time in question, but the cause of action did not arise out of the New York negotiations.[8] In the case at bar, the contacts with New York consisted of a significant volume of communications

relating exclusively to the alleged insurance contract. *Chemical Bank* is therefore inapposite.[9]

Plaintiffs have also argued that jurisdiction exists over the defendants by virtue of N.Y. CPLR § 301 ("doing business"), and pursuant to N.Y. Ins.Law § 59–a. In light of my finding that jurisdiction exists under N.Y. CPLR § 302, I need not decide whether jurisdiction could be found under any other provision.

My finding of personal jurisdiction over the moving defendants disposes of the contention that service of process was improper. Service was properly effected by registered mail as provided in Fed.R.Civ.P. 4(i)(1)(D) (Supp.1977).

SO ORDERED.

---

8. Defendants' reliance on *Chemical Bank* is apparently based upon the mistaken notion that the strongest factor advanced by the plaintiffs in favor of N.Y. CPLR § 302(a)(1) jurisdiction is Asnani's visit to New York while the deal was in negotiation. The Asnani and Nutter affidavits establish that Asnani's visit was not related to the China Union matter and is irrelevant to a determination of personal jurisdiction under the § 302(a)(1) test.

9. Defendants also rely on *McKee Electric Co. Inc. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967). That case involved a dispute between an agent and its

principal wherein the plaintiff/agent sought to rely on its own New York activities as a predicate for § 302(a)(1) jurisdiction over the defendant principal. The *McKee* holding—that no § 302(a)(1) jurisdiction existed—was subsequently confined to its facts by the unanimous *Parke-Bernet* court, 26 N.Y.2d at 19, n.2, 308 N.Y.S.2d 337, 256 N.E.2d 506. As no agency relationship exists between plaintiffs and the moving defendants in the instant case, and plaintiffs rely on defendants' activities to sustain a finding of personal jurisdiction, the *McKee* case is also inapposite.