**AMERICAN SAVINGS BANK,
F.S.B., Plaintiff,**

v.

**CHESHIRE MANAGEMENT COMPANY, INC., Ronald J. Nemeyer, Amity Bank, Richard Weinstein, and John Doe, individually and as Trustee of a certain Irrevocable Trust Agreement dated July 8, 1988 (John Doe being a fictitious name the true identity being unknown to the plaintiff), Defendants.**

No. 88–Civ. 5465 (JES).

United States District Court,
S.D. New York.

Aug. 18, 1988.

Joseph A. Vogel, Gabriel B. Schwartz, and Brett Wettich, Hahn & Hessen, New York City, for plaintiff.

Carol A. Jablonski, Jaffe & Asher, New York City, Richard P. Weinstein, Pearson, Baun and Weinstein, West Hartford, Conn., Ellery E. Plotkin, Slavitt, Comery and Vardamis, Norwalk, Conn., Steven A. Lauer, Cheshire Management Co., Inc., Wallingford, Conn., for defendants.

## MEMORANDUM OPINION AND ORDER

CONBOY, District Judge:

The plaintiff, American Savings Bank, F.S.B. ("ASB"), loaned the defendant Cheshire Management Co. ("CMC") $12 million in two loans. CMC is in the real estate syndication business. CMC acts as general partner or as limited partner in other partnerships. *See* Ex. A to Affidavit of H.L. Van Varick, executed Aug. 4, 1988 (the "Loan and Security Agreement"), at schedule 7.32. As consideration for the loans, CMC granted the plaintiff a security interest in five groups of assets, including "receivables," "fees," and "certain partnership interests," all of which are defined terms in the loan agreement. *See* Loan and Security Agreement at §§ 6.01—6.05. CMC further accepted fiduciary responsibility as ASB's trustee and agent for the collection of all receivables. *See id.* at § 10. Immediately at issue is the distribution of $1,136,074, realized from the sale of certain real property by a limited partnership, in which CMC told ASB that it possessed a 100% general partnership interest, *see* Loan and Security Agreement at schedule 7.32, called the "CMC–Pickering Run Limited Partnership" ("Pickering Run").

In the spring of 1988, CMC advised ASB that the Pickering Run partnership had a contract to sell its interest in its only asset, certain real property. *See* Van Varick Aff. at para. 15. ASB informed CMC that it expected to receive the cash proceeds of the sale as a mandatory payment, as required by the Loan and Security Agreement. *See id.* On July 7, 1988, Van Varick and Joseph LaMagna, Senior Vice President and Controller of ASB, met with William Thompson, Controller of CMC, and Paul Abbott, a consultant to CMC, to review the overall status of the CMC loans. *See id.* at para. 16.

The next day, July 8, 1988, CMC assigned and transferred (the consideration, if any, is not stated) 65% of its general partnership interest, of 100%, in Pickering Run to an Irrevocable Trust (the "July 8 trust"). The fourteen page document contains six articles. *See* Ex. J. to Van Varick Aff. The beneficiaries of the July 8 trust include

the persons and entities who have provided goods or services or will provide goods or services during the term of th[e] trust, including, but not limited to, vendors independent contractors, [sic] consultants under contract with [CMC], attorneys and accountants (a) to [CMC], or (b) to (i) any partnership of which [CMC] is either a general partner, or (ii) any partnership which is currently, directly or indirectly, under the control of [CMC], but exclusive of persons or entities providing goods or services to or for the benefit of the real properties owned by any of such partnerships. The term "Beneficiary" when used herein also shall include employees of [CMC] on or after July 1, 1988 ...; and *the term "Beneficiary" shall exclude all persons*

*or entities who have loaned funds to [CMC], any person or entity who has a lien on any assets of [CMC]....*

Ex. J. to Van Varick Aff. at Art. I(B) (emphasis added).

Five days later, Pickering Run sold its only asset, the parcel of real property. The net proceeds of the sale were subsequently paid over to those persons or entities holding general or limited partnership interests pursuant to the CMC–Pickering Run Limited Partnership Agreement. *See* Ex. H to Van Varick Aff. CMC was supposed to receive 35% of its funds directly, with the July 8 trust supposedly receiving 65%. *See* Ex. J to Van Varick Aff. at Art. I(A).

CMC delivered certain proceeds to Richard Weinstein, one of the defendants in this action, to place in escrow. Weinstein received a total of $536,000.00, to be placed in two separate escrow accounts. *See* Ex. M to Affidavit of Joseph A. Vogel, executed Aug. 15, 1988. Giving the benefit of the doubt to the defendants,[1] this represented approximately 47% of the total amount received by CMC from the sale, approximately $1.136 million, including proceeds from the sale in the amount of $908,703.67, *see* Ex. H to Van Varick Aff., as well as a commission CMC received from the sale in the amount of approximately $228,000.00. Although it is not clear,[2] approximately $600,000.00 was delivered to the trustee of the July 8 trust.[3] This represented approximately 52% of the proceeds from the sale. Thus, the trust did not in fact receive 65% of CMC's partnership interest.

Weinstein placed $136,000.00 of the money given to him into an escrow account for the benefit of an individual named R. Breault, "because of a possible claim by Breault resulting from his ownership of a partnership interest in Pickering Run." This possible claim had not been disclosed to ASB when it accepted the distribution rights in CMC's partnership interest in Pickering Run as collateral for its loans. *See* Ex. A to Van Varick Aff. at schedule 7.32 (CMC 100% general partner of CMC–Pickering Run Limited Partnership). Weinstein placed $400,000.00 in a second escrow account, on behalf of defendant Amity Bank. Eventually, Weinstein paid Amity Bank $311,883.44;[4] he returned $88,511.24 to the CMC–Pickering Run Limited Partnership. *See* Ex. M to Vogel Reply Aff.

By August 12, 1988, the funds had been applied as follows:

| | |
|---|---|
| Irrevocable Trust | $341,762 |
| Amity Bank | $311,490 |
| CMC | $483,452 |

*See* Ex. O to Vogel Reply Aff. The full amount of the $136,305.55 originally placed in escrow for Breault was delivered by the escrow agent to Pickering Run, *not* Breault. *See* Ex. M to Vogel Reply Aff. CMC has applied for its own use at least $483,452 of the total proceeds of the Pickering Run sale, of which only $42,278 presently remains as cash on hand.[5]

In the first week of August (after a meeting held August 1 between plaintiff and CMC, at CMC's offices in Connecticut, at which time ASB inquired as to the disbursements of the proceeds from the Pickering Run sale) CMC paid $134,605 in payroll. *See* Ex. P to Van Varick Aff. For the *months* of June and July, CMC's payroll expenses totalled $99,969 and $103,804, respectively. Thompson explained that CMC paid approximately $46 to $50 thousand for accrued leave to twenty employees. CMC felt obligated to make these

---

1. The court assumes that CMC did not place any of the commission it received from the sale into the trust.

2. The court does not have the transcript of the hearing on this matter. References to testimony cannot be buttressed with page citations.

3. Steven Lauer, general counsel to CMC, testified that he believed the title company disbursed approximately $590,000.00 to the trust.

4. Amity had had the sheriff serve a garnishment on CMC and others. Ronald Nemeyer, Chief Executive Officer of CMC, personally guaranteed the loan that Amity had won a judgment on. Nemeyer did not personally guarantee the ASB loans.

5. William Thompson testified that CMC has approximately another $10,000.00 on hand, received from monthly management fees, loan repayments from limited partners, and extraordinary receipts.

payments to allay the fears of, and prevent the exodus of, its employees, because it had been making such payments to other employees who had been leaving the company. CMC also disbursed $51,250 for "loans to [limited] partnerships" in the first week of August; it disbursed $90,870 for "employment contract compensation;" and it disbursed $60,000 for "key employee incentive bonuses." *See* Ex. P to Vogel Reply Aff. As CMC concedes, "its financial condition is troubled." Memorandum in Opposition to [Plaintiff]'s Motion For Preliminary Injunction at 21.

Lauer and Thompson were two individuals receiving bonuses. They each received a bonus of $20,000.00 on top of their salaries of $80,000.00, or 25% of their base salaries. Ronald Nemeyer's sister, Terrell, a former employee and officer, received some of the money distributed as "employment contract compensation."

On August 5, 1988, the Honorable Louis L. Stanton of this court granted the plaintiff an *ex parte* temporary restraining order. The action is before the court on plaintiff's motion, pursuant to Fed.R.Civ.P. 65(a)(1), for a preliminary injunction. The court heard testimony and argument on August 16 and 17, 1988. This Memorandum Opinion and Order constitutes the court's findings of fact and conclusions of law, pursuant to Fed. R.Civ.P. 52(a).

## LEGAL ANALYSIS

### A. Personal Jurisdiction

The defendants Ronald J. Nemeyer, Richard P. Weinstein, and Henry Lyons, III ("John Doe")[6] move to dismiss the complaint pursuant to Rule 12(b)(2), lack of personal jurisdiction. The plaintiff asserts that there is a likelihood that personal jurisdiction exists over these defendants under New York's long-arm statute, and pos-

sibly under principles of "doing business." *See* Reply Aff. of Joseph A. Vogel at para. 26. The plaintiff requests expedited ("immediate") discovery to (a) ascertain the names, addresses, and circumstances under which the present holders (other than the defendants) of the proceeds of the sale of the Pickering Run property received them, as well as the location and amount of the proceeds and (b) determine the merits of the defendants' jurisdictional defense.

It will be necessary to address the motions of the individual defendants to dismiss for lack of personal jurisdiction.

A court must have in personam jurisdiction over a party before it can validly enter even an interlocutory injunction against him. Where a challenge to jurisdiction is interposed on an application for a preliminary injunction "[t]he [sic] plaintiff is required to adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits."

*Visual Sciences, Inc. v. Integrated Communications Inc.*, 660 F.2d 56, 59 (2d Cir. 1981) (citations omitted, brackets in original) (quoting *Industrial Elecs. Corp. v. Cline*, 330 F.2d 480, 482 (3d Cir.1964)). Adequate factual findings are required. *See id.*

### 1. Nemeyer

■ Nemeyer is Chief Executive Officer of CMC. The jurisdictional question is not difficult, in a legal sense, as to him. New York has rejected the "fiduciary shield" doctrine.[7] *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 472, 522 N.E.2d 40, 47, 527 N.Y.S.2d 195, 202 (1988). Thus, Nemeyer individually is subject to jurisdiction in New York under CPLR 302, the "long-arm" statute, if he has transacted any business within New York, and the

---

**6.** Amity Bank has reached an agreement with the plaintiff. Among other things, the agreement postpones Amity's motion to dismiss for lack of personal jurisdiction.

**7.** The "fiduciary shield" doctrine "provides that an individual should not be subject to jurisdiction if his dealings in the forum State were solely in a corporate capacity. It is based upon

the notion that it is unfair to subject a corporate employee personally to suit in a foreign jurisdiction when his only contacts with that jurisdiction have been undertaken on behalf of his corporate employer." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467–68, 522 N.E.2d 40, 44, 527 N.Y.S.2d 195, 199 (1988).

plaintiff's cause of action arises from that transaction. *See Kreutter,* 71 N.Y.2d at 466–73, 522 N.E.2d at 43–48, 527 N.Y.S.2d at 198–203 (court may assert jurisdiction over individual "who was a primary actor in the transaction ... in New York" on behalf of corporation); N.Y.CPLR § 302(a)(1).

Plaintiff's cause of action arises from the Loan and Security Agreement. Van Varick testified that he met in New York City with Nemeyer to negotiate the loan. Further, Van Varick testified that he met with Nemeyer in New York in 1988 to discuss the loans.[8]

Generally, execution alone has been held insufficient to confer jurisdiction under this statute. *See, e.g., Galgay v. Bulletin Co.,* 504 F.2d 1062, 1065–66 (2d Cir.1974) (execution not determinative; more important that contract was negotiated outside New York); *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.,* 439 F.2d 428, 432 (2d Cir.1971) (jurisdiction proper where "[t]he level of activity in New York by the[ ] defendants far exceeded the bare execution of employment contracts in New York"). Jurisdiction was upheld where officers from foreign corporations came to two meetings at the offices of a corporation having its principal place of business in New York, and agreements were reached at those meetings, *despite* that some of the documents were executed outside New York. *See Burlington Indus. v. Salem Int'l Co.,* 645 F.Supp. 872, 873–75 (S.D.N.Y.1986).

On the facts developed, the plaintiff has established that there is at least "a reasonable probability of ultimate success" on the question of personal jurisdiction over Ronald Nemeyer when the action is tried on the merits. He appeared in New York prior to, and after, the creation of the Loan and Security Agreement. Each of these appearances related to the agreement. Nemeyer probably "purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invok-

ing the benefits and protections of its laws." *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 109, 107 S.Ct. 1026, 1031, 94 L.Ed.2d 92 (1987) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)).

### 2. Lyons

The court fails to see any basis for asserting personal jurisdiction over the Trustee. Even assuming, as plaintiff argues, that Lyons was a willful conspirator in the conversion by CMC, jurisdiction under N.Y. CPLR § 302(a)(3) is not established. In cases of conversion, the injury is "deemed to occur in the place where the defendant's acts respecting the property are committed." *Chemical Bank v. World Hockey Ass'n,* 403 F.Supp. 1374, 1380 (S.D.N.Y.1975), *quoted in Associated Trade Dev., Inc. v. Condor Lines, Inc.,* 590 F.Supp. 525, 528 (S.D.N.Y.1984).

> Indirect economic injury in New York cannot, even if proven, sustain jurisdiction. *See ... Fantis Foods v. Standard,* 49 N.Y.2d 317, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980). (Holding N.Y. CPLR § 302(a)(3) to be inapplicable where the only connection between the claimed conversion and injury alleged in New York was the fact that plaintiff was incorporated and maintained offices here).

*Condor Lines, Inc.,* 590 F.Supp. at 528 (citation omitted). Therefore, the court is without jurisdiction to enter a preliminary injunction directed at Lyons. Lyon's motion to dismiss the complaint is granted, without prejudice. *See* 5 J. Moore, J. Lucas & J. Wicker, *Moore's Federal Practice* para. 41.14 at 41–185 to –191 & n. 6 (2d ed. 1988) (collecting cases).

### 3. Weinstein

The same analysis applicable to Lyons applies to Weinstein. The complaint is dismissed without prejudice as to him as well. Parenthetically, the court notes that at the

---

8. The agreement recites that it "has been made and executed and is to be performed in the State of New York." *See id.* § 20.12. Nemeyer executed the agreement on CMC's behalf. It is not clear whether Nemeyer actually executed the contract in New York.

hearing ASB dropped its request for entry of a preliminary injunction against Weinstein. The plaintiff adopted this position after Weinstein repeated his position, expressed to ASB in a letter dated August 10, 1988, *see* Ex. M to Vogel Reply Aff., that he no longer retains any of the funds from the Pickering Run sale placed with him as escrow agent.

## B. Preliminary Injunction

■ To merit the entry of a preliminary injunction, the plaintiff must demonstrate: (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.

*Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir.1987) (per curiam).

CMC does not argue that it failed to remit to plaintiff 100%[9] of the commission it earned from the sale of the Pickering Run real property. It concedes that it has failed to remit to ASB any portion of the $228,000.00 it received as a commission. However, CMC does argue that it could assign its partnership interest unencumbered to the Irrevocable Trust.

The critical section is section 6.01 of the Loan and Security Agreement. That section grants the plaintiff a security interest in CMC's "Receivables." These are defined in section 1.35 to include

all present and future accounts ..., contract rights, ... promissory notes ... and other general intangibles, ... and all forms of obligations whatsoever owing, represented by or relating to ... Partnership Interests.

*See* Ex. A to Van Varick Aff. CMC argues that "Receivables" "does not include Partnership Interests as such, but only includes 'obligations ... owing, represented by or relating to ... Partnership Interests.'" Memorandum in Opposition at 8. The distinction CMC draws is with section 6.05, in which the plaintiff was granted a security interest in certain Partnership Interests themselves. CMC argues:

The security interest granted in Section 6.01 simply gives ASB a security interest in cash that flowed into CMC as a result of CMC's ownership of the Partnership Interests. Section 6.01 does not include other rights resulting from CMC's ownership of the Partnership Interests. It also does not grant ASB a security interest in the partnership interest itself. In other words, ASB's security interest only attaches when CMC obtains a noncontingent right to payment from a partnership as the result of its ownership of a Partnership Interest. Therefore, CMC was free to transfer or assign its partnership interest in all partnerships on Schedule 7.32 until such noncontingent right to payment came into being.

*Id.* at 9–10.

Besides the commission funds withheld, the $88,511.24 that Weinstein returned to Pickering Run should have been turned over to plaintiff. Further, the $136,305.55 that had been held for Breault was subject to ASB's security interest. CMC implicitly conceded this, in papers it submitted before Weinstein disbursed these funds. *See* Memorandum in Opposition to American Savings Bank's Motion For Preliminary Injunction at 13–14 (if the funds held for Breault "are paid over to CMC, then, and only then, will ASB's lien attach by reason of CMC's continuing ownership of that portion of a general partnership interest in Pickering Run").

Regarding CMC's argument that it could assign its partnership interest unencumbered to the July 8 trust, the court notes that a partnership arises only by contract between the partners. *See Greenspon v. Comm'r of Internal Revenue*, 229 F.2d 947, 951 (8th Cir.1956); *Trenbath v. Platt*, 20 N.Y.S.2d 244, 247 (Sup.Ct.1940), *aff'd mem.*, 264 A.D. 708, 34 N.Y.S.2d 526 (1st Dep't), *leave to appeal denied*, 264 A.D. 755, 35 N.Y.S.2d 711 (1st Dep't 1942). The

---

**9.** Because CMC had already defaulted on its interest payments under the loan agreement, it owed 100%, rather than 70%, of all "collateral proceeds" to the plaintiff. Collateral proceeds include cash proceeds of real estate brokerage fees. *See* Loan Agreement §§ 1.08, 6.04.

contract creates for the partner a partnership interest. "A partner's interest in the partnership is his share of the profits and surplus." Conn.Gen.Stat.Ann. § 34–64 (West 1987), *quoted in Fidelity Trust Co. v. BVD Assocs.*, 196 Conn. 270, 282, 492 A.2d 180, 187 (1985). "[A] partner may assign his [contractually created] right to the distribution of profits from the partnership." *Bricklin v. Stengol Corp.*, 1 Conn. App. 656, 667, 476 A.2d 584, 590 (Conn. App.Ct.) (citing Conn.Gen.Stat.Ann. §§ 34–64 to –65 (West 1987), *certification denied mem.*, 194 Conn. 803, 482 A.2d 709 (1984)). "A partner may transfer his interest to a third person as trustee, but *he cannot convey his position as partner.*" G.B. Bogert & G.T. Bogert, *The Law of Trusts and Trustees* § 112 at 321 (1984) (emphasis added, footnote omitted).

■ There is a substantial likelihood the Pickering Run partnership interest that CMC transferred or assigned was encumbered. "Receivables" includes all "accounts" and "contract rights." *See* Loan Agreement § 1.35. The plaintiff has "a first lien on and first security interest in all of [CMC's] Receivables, *and all proceeds thereof.*" Loan Agreement § 6.01. Arguably, ASB possessed a security interest in CMC's contract right, emanating from the CMC—Pickering Run Limited Partnership Agreement, to receive its distribution of profits. Thus, when CMC assigned its right under that agreement to the Trust, the corpus was encumbered by the plaintiff's security interest. The contract right [10] to these cash proceeds already existed. "An assignee 'is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor.'" *State Bank of India v. Walter E. Heller & Co.*, 655 F.Supp. 326, 331 (S.D.N.Y.1987) (quoting *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y. 2d 121, 126, 325 N.E.2d 137, 139, 365 N.Y. S.2d 808, 811 (1975)). It therefore is irrele-

vant that the Trust purports to preclude payment to the plaintiff.

Even if ASB did not have a security interest in the contract right of CMC to the proceeds of the sale, it appears that the partnership interest necessarily resided in CMC after it came into being, in spite of CMC's anticipatory establishment of the trust. Under such circumstances, CMC's assignment necessarily would include ASB's security interest, as CMC implicitly concedes. The case of *Burnet v. Leininger*, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665 (1932), is instructive. In *Burnet*, the respondent, Leininger, was a partner in a partnership. *See id.* at 139 n. 1, 52 S.Ct. at 346 n. 1. Leininger entered an agreement with his wife, prior to receiving his partnership interest, whereby she became an equal partner in his partnership interest. *See id.* at 138, 139 n. 1, 52 S.Ct. at 345, 346 n. 1; *id.* at 140, 52 S.Ct. at 346 ("It was the husband's interest that was the subject of the agreement."). The respondent argued that he should be taxed on only one-half of the income earned on his share of the partnership, because his wife owned the other one-half. *See id.* at 138, 52 S.Ct. at 345.

The Supreme Court rejected the respondent's argument.

[T]he statute provided that there should be included in computing the net income of Leininger *his distributive share* of the net income of the partnership. That distributive share … was one-half. In view of the clear provision of the statute *it cannot be said that Leininger was required to pay tax upon only a part of this distributive share because of the assignment to his wife.*

*Id.* at 141, 52 S.Ct. at 347 (emphasis added). The Court analogized to *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930) (Holmes, J.). Quoting from *Earl*, the Court stated that "[t]here is no doubt … that the statute could tax salaries to those who earned them and provide that the tax

---

**10.** Section 9–106 of the U.C.C. has been amended to eliminate the term "contract right." Instead, an account is defined as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instru-

ment or chattel paper, *whether or not it has been earned by performance.*" *E.g.*, N.Y. CPLR § 9–106 (McKinney Supp.1988) (emphasis added).

could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it." *Id.* at 142, 52 S.Ct. at 347 (quoting *Earl,* 281 U.S. at 114–15, 50 S.Ct. at 241).[11] The Court concluded that "the right of the [assignee] was derived from the agreement with her [assignor] and rested upon the distributive share which he had, and continued to have, as a member of the partnership." *Id.* at 142–43, 52 S.Ct. at 347; *see Balkwill v. Comm'r of Internal Revenue,* 77 F.2d 569, 570 (6th Cir.1935) ("An assignee of a partnership interest receives his income not from the firm, but from the assigning partner."), *cert. denied,* 296 U.S. 609, 56 S.Ct. 127, 80 L.Ed. 432 (1935). Under these cases, the plaintiff certainly has a substantial case that the partnership interest here resided in CMC, if even for a moment, prior to its passage to the trust, and that its security interest attached while the partnership interest resided in CMC.

Additionally, the very act of placing its partnership interest in trust most likely constituted a breach of CMC's contractual duty, and also its fiduciary duty to ASB to collect its distribution from the Pickering Run sale for ASB. *See* Loan and Security Agreement at § 10 ("[CMC] shall collect ... the proceeds of Partnership Interests ... as a trustee and agent for [ASB]").

### 1. Irreparable Injury

There is no question that CMC converted some, and a likelihood that CMC converted all, of the proceeds (which includes the commission) of the sale of the Pickering Run property. Given the company's troubled financial state, it can be anticipated that if the court did not enter an injunction,

CMC would propose other, similar "assignments" to Trusts of other Partnership Interests, recipients of distributions in which the plaintiff has a secured interest.[12] ASB argues that "CMC's brazen use of the Bank's collateral to pay its expenses raises the real likelihood that CMC is without other available assets." Plaintiff's Memorandum at 5. This has been borne out by the testimony.

In *Mishkin v. Kenney & Branisel, Inc.,* 609 F.Supp. 1254 (S.D.N.Y.), *aff'd mem.,* 779 F.2d 35 (2d Cir.1985), Judge Weinfeld, finding that the plaintiff demonstrated that "there can be little doubt that the defendants are currently engaged in efforts to dispose of their assets," *id.* at 1256, granted a preliminary injunction. *Id.* at 1257.

> [T]o deny the [plaintiffs] the requested relief would permit the defendants to dispose of the balance of their meager and inadequate assets by transferring them outside the jurisdiction and thereby frustrate the enforcement of any judgment the [plaintiffs] may obtain. In these circumstances, the preliminary relief plaintiffs seek is entirely appropriate.

*Id.*

This view is reflected in the generalized statement that "[w]here a plaintiff's injury is theoretically compensable in money damages, but, as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect the plaintiff from irreparable injury." *Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860, 912 (S.D.N.Y.1986); *see Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 386 (7th Cir.1984) (Posner, J.) (damages remedy is inadequate where they "may be unobtainable from the defendant

---

**11.** The defendants argued at the hearing that the plaintiff, by seeking recovery of the funds placed in the trust, was attempting to capture fruit growing on branches to which it has no right. In *Earl,* the Supreme Court, rejecting the taxpayer's attempt to attribute half of his income to his wife, in order to reduce his tax liability, stated: "[W]e think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they

grew." *Lucas v. Earl,* 281 U.S. 111, 115, 50 S.Ct. 241, 241, 74 L.Ed. 731 (1930).

**12.** In response to a hypothetical question, Thompson stated that even were the court to allow CMC to use the approximately $52,000.00 that it currently has on hand, CMC would likely run out of money this month. Thompson stated that the money would be used to meet payroll, and that CMC would try to keep its creditors at bay.

because he may become insolvent before a final judgment can be entered and collected").

### 2. Likelihood of Success

The plaintiff has documented that it has a fully perfected first lien in some, if not all, of the proceeds from the Pickering Run transaction, and a protected first lien in the distributions due CMC from other limited partnerships which CMC might assign in the future to trusts. By converting proceeds, CMC has breached the Loan Agreement. As discussed earlier, *see* discussion *supra* at 47–49, without expressing a conclusion on the issue, the case law would appear to reject CMC's position that its assignment to the trust was unencumbered. ASB has demonstrated a likelihood that it will succeed on the merits.

### 3. Balance of Equities

The court must consider whether the hardship caused by the denial of injunctive relief will outweigh any potential injury that may be suffered if the relief is granted. *See Roland Mach. Co.*, 749 F.2d at 387. When the plaintiff demonstrates a probability of success on the merits, the balance of hardships need *not* tip so decidedly in his favor as when he demonstrates only that serious questions are raised. *See Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 13 & n. 5 (2d Cir.1982); *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir.1973) (per curiam).

The plaintiff asserts that if CMC is not enjoined, its actions "will for all time jeopardize the Bank's ability to realize upon its security." Plaintiff's Memorandum at 8. CMC argues that entry of an injunction that freezes its assets will put it out of business. Memorandum in Opposition at 20–21. First, the plaintiff does not seek to freeze CMC's assets. It seeks to prohibit CMC from dissipating its collateral. Second, CMC's argument is perverse. In effect it asks that it be allowed to continue converting funds, and harm not only the plaintiff, but possibly other creditors as well. *See* note *supra* 13.

The defendant also asks that the court consider the "public interest," *see Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 711 (2d Cir. 1982), which is represented by "all those individuals and entities which own limited partnership interests in the 36 limited partnerships managed by CMC." Memorandum in Opposition at 21. Unlike the group identified as the public in *Standard & Poor's*, the 500 to 600 persons owning partnership interests in CMC vehicles do have a simple, though possibly ineffective, remedy. They can sue CMC, if CMC has harmed them. *Cf. Standard & Poor's*, 683 F.2d at 711–12 (court not able to envision "any simple effective remedy for compensating [thousands of] traders" who might be injured if contracts closed or settled over a 23 month period between denial of preliminary injunction and entry of permanent injunction had to be invalidated).

### CONCLUSION

It is ORDERED that, pending the final resolution of this action,

(1) CMC is mandatorily enjoined to direct any employee who qualifies as a beneficiary of the trust created July 8, 1988, which trust received as a corpus CMC's partnership interest in the CMC—Pickering Run Limited Partnership, to immediately submit an invoice, which CMC is ordered to approve, to the trustee, Henry Lyons, III, for the entire corpus of $341,762.00. CMC is ordered to place the corpus in escrow with the Clerk of this Court by 5 p.m. Friday, August 19, 1988;

(2) CMC, and those individuals specified in Fed.R.Civ.P. 65(d), are enjoined from creating any trust to receive CMC's partnership interest in any partnership agreement in which ASB has a security interest in the collateral proceeds of CMC's partnership interest, or otherwise transferring, converting, or assigning its partnership interest in any partnership agreement in which ASB has a security interest in the collateral proceeds of CMC's partnership interest;

(3) CMC, and those individuals specified in Fed.R.Civ.P. 65(d), are enjoined from converting, transferring, assigning or oth-

erwise asserting dominion and control over any collateral or collateral proceeds belonging to ASB. CMC is ordered to place any money received by it from distributions to partnership interests, and from all other sources of collateral or collateral proceeds, into the escrow account to be established with the Clerk of this Court as soon as practicable after receipt of any such money;

(4) CMC, and those individuals specified in Fed.R.Civ.P. 65(d), are enjoined from exercising any control over any proceeds [13] from the Pickering Run sale that remain in the hands of any such persons, and are ordered to deposit such funds in the escrow account with the Clerk of this Court as soon as practicable; and

(5) Ronald Nemeyer, and any of his agents, servants, or attorneys receiving actual notice of this injunction, are enjoined from converting, transferring, assigning, or otherwise exercising dominion and control over the proceeds of the sale generated by the property belonging to Pickering Run, as well as all other of ASB's collateral or the proceeds thereof now or hereafter in his possession.

Plaintiff's motion for leave to commence immediate discovery of the whereabouts of the proceeds of the Pickering Run sale, and of jurisdictional facts, is denied with leave to renew before Judge Sprizzo. The motion of defendants Weinstein and Lyons for sanctions pursuant to Fed.R.Civ.P. 11 is referred to Judge Sprizzo.

SO ORDERED.

---

**13.** "Proceeds" means any money flowing to CMC, or to the July 8 trust, whether it be part of CMC's partnership interest or its commission.