**PLAZA REALTY INVESTORS, Plaintiff,**

v.

**Guy B. BAILEY, Jr. and VIP Center, Defendants.**

**No. 76 Civ. 4543 (WCC).**

United States District Court, S. D. New York.

Dec. 14, 1979.

338

Zimmer, Fishbach & Hertan, New York City, for plaintiff; Louis C. Fieland, New York City, of counsel.

John W. Kearns, Miami, Fla., for defendants; Arum, Friedman & Katz, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This action on a promissory note (the "Note") in the amount of $1,932,000 plus interest by plaintiff Plaza Realty Investors ("Plaza"), successor to Pease & Elliman Realty Trust, against the maker of the Note, VIP Center, and against Guy B. Bailey, Jr. ("Bailey, Jr."), managing general partner of VIP Center, was originally commenced in the Supreme Court of the State of New York, County of New York, by service of a summons and motion for summary judgment pursuant to Section 3213 of New York's C.P.L.R.[1]  It was removed to this Court under 28 U.S.C. §§ 1441(a) and 1446, with federal jurisdiction being founded upon diversity of citizenship.  Personal jurisdiction is premised upon Section 302 of the C.P.L.R.

On March 9, 1977, this Court granted plaintiff's unopposed motion for summary judgment on the Note against defendant VIP Center.  Plaintiff's motion for summary judgment against Bailey, Jr. was denied

1. Section 3213 of the C.P.L.R. provides in relevant part:

"When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint.  The summons served with such motion papers shall require the defendant to submit answering papers on the motion within the time provided in the notice of motion .  . If the motion is denied, the moving and answering papers shall be deemed the complaint and answer, respectively, unless the court orders otherwise."

since defendant Bailey, Jr. alleged that he was not personally liable on the Note and that he was not subject to the jurisdiction of this Court under Section 302 of the C.P. L.R., allegations that raised issues of fact requiring a trial on the merits of plaintiff's claim. A bench trial on plaintiff's claim against Bailey, Jr. was held on July 13 and 15, 1977 and extensive post-trial briefing followed. This opinion and order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R. Civ.P.

### The Interested Parties

Plaintiff Plaza is a Massachusetts business trust doing business as a real estate investment trust with offices at 919 Third Avenue in New York City.

Ira J. Hertan ("Hertan") is a trustee of plaintiff, its secretary during the time of the transaction, and a member of the law firm of Zimmer, Fishbach & Hertan which represented plaintiff in this action. Steven B. Haberman ("Haberman") is a trustee of plaintiff and was its president during the time of this transaction.

Defendant VIP Center is a limited partnership organized under the laws of the State of Indiana. VIP Center (the "project") is also the name applied to a multipurpose real estate complex situated in Indianapolis, Indiana which was owned by the limited partnership.

Defendant Bailey, Jr. is a resident of the State of Florida. At the time of the transaction in dispute, he was a member of the Florida law firm of Pettigrew & Bailey. Bailey, Jr. is currently the managing general partner of VIP Center.

The two limited partners of VIP Center are Guy B. Bailey, Sr. ("Bailey, Sr."), the father of defendant Bailey, Jr., and Areca Stone Bailey, Bailey, Sr.'s wife. Mr. and Mrs. Bailey, Sr. are residents of the State of Florida.

George V. Ginger ("Ginger") was the general partner of VIP Center prior to the admission of Mr. and Mrs. Bailey, Sr. as limited partners and Bailey, Jr. as managing general partner. Ginger continued as a general partner of VIP Center subsequent to their admission, but after the Baileys were admitted Ginger lacked authority to act for the partnership.

### The Facts

#### A. The Initial Arrangement

In 1972, plaintiff purchased from G. V. Ginger & Associates ("Ginger & Associates") a parcel of land located in Indianapolis subject to a first mortgage in the approximate amount of $7,000,000 held by Bankers Trust Company ("Bankers Trust"), a banking corporation organized under the laws of the State of New York.[2] As part of the sales transaction, plaintiff simultaneously leased this parcel of land, on a long-term basis, back to Ginger & Associates, which was building on the land a multipurpose center that would include commercial, residential and office space.[3]

In 1973, Ginger organized VIP Center as an Indiana limited partnership with Ginger as the general partner and Ginger & Associates as the limited partner. VIP Center became the owner of the improvements being constructed on the land and lessee under the land lease with plaintiff.

In mid-1974, the limited partnership ran out of money to complete the project, and VIP Center's land lease with plaintiff, as well as the first mortgage held by Bankers Trust, went into default. As a result of VIP Center's default its interest in the leasehold was assigned to plaintiff, which became the effective owner of the buildings as well as of the land that comprised the project. During this period and thereafter, Ginger unsuccessfully attempted to secure

---

2. As part of this transaction, Chemical Bank acquired a purchase money second mortgage on the subject real estate. Prior to the closing of the transaction at issue (between plaintiff and the Baileys), plaintiff paid Chemical Bank $500,000 and extinguished the second mortgage.

3. It is unclear whether VIP Center or plaintiff was responsible for making payments on the loan secured by the Bankers Trust mortgage on the land.

new partners who would advance the necessary funds to complete the project in exchange for the substantial tax losses available to the limited partnership's members.

## B. The Search for New Investors

In November of 1974, Envicon Group ("Envicon"), acting as a broker/syndicator in·obtaining investors for the project approached Bailey, Sr. to interest him in purchasing the limited partnership which owned the project. Envicon proposed that it become the general partner and Mr. and Mrs. Bailey, Sr. the limited partners of the limited partnership. On Christmas Day 1974, Bailey, Sr. asked his son Bailey, Jr. whether any of the lawyers in the law firm of Pettigrew & Bailey were available to go to New York the next day to discuss the Envicon deal. Bailey, Jr. asked one of his law partners, Owen Freed ("Freed"), whether he was available to go to New York the next day. Freed said that he was available and Bailey, Jr. asked him to go immediately to Bailey, Sr.'s home to discuss the transaction. Bailey, Sr. and Freed met that night and reviewed the terms of the proposed agreement with Envicon. The next morning, Freed left for New York.

At trial, both Bailey, Sr. and Freed testified that when Freed went to New York he was representing Bailey, Sr. and his wife. Bailey, Jr. testified that he did not authorize Freed to go to New York on his behalf but that he was interested in and knew what was happening in New York because his law firm was representing his parents and "I was interested as a lawyer, but I was not directly handling that representation or that transaction . . .." Trial Transcript (hereafter "Tr.") at 190.

In New York, Freed met with representatives of Envicon, but they were unable to reach an agreement and the negotiations between Freed and Envicon's representatives were terminated.

When Haberman and Hertan, trustees and officers of plaintiff, learned that the negotiations between Envicon and its client had been unsuccessful, Haberman requested that Envicon give its consent to having plaintiff negotiate directly with Envicon's client with the proviso that Envicon's position as broker would be protected. Envicon consented and Haberman was given a Florida telephone number where Envicon's client could be reached. Haberman telephoned Florida and indicated that plaintiff was prepared to consummate the transaction directly with Envicon's former client.

At trial, there was conflicting testimony as to whom Haberman spoke with when he called Florida. Haberman testified that he was told by Envicon to "call the law offices of Pettigrew and Bailey . . . and try to contact the principals there", Tr. at 71, and that when he called he was on a speakerphone and "there were a number of other men in the room, and I believe I spoke with Guy Bailey, Jr." Tr. at 72, but Bailey, Sr. testified that it was he who spoke with Haberman.

During this telephone conversation, the parties discussed the terms of the proposed real estate transaction, to be discussed *infra,* and Haberman was informed that Freed was still in New York and that Freed would be contacted and told to negotiate directly with plaintiff.

## C. The December 27, 1974 Meeting in New York

### 1. The Terms of the New Arrangement

At a meeting in New York on December 27, 1974, Hertan, Haberman and Freed agreed to all of the monetary terms of the proposed transaction: Mr. and Mrs. Bailey, Sr. would transfer to the limited partnership $500,000 in cash and $600,000 in the form of two promissory notes in the amounts of $350,000 and $250,000, respectively. VIP Center would then pay the cash to Bankers Trust to cure the default on the first mortgage held by that bank. Haberman, Hertan and Freed hoped that in return Bankers Trust would agree to renegotiate the terms of the first mortgage so as to reduce the principal and interest payments provided therein. As between plaintiff and Mr. and Mrs. Bailey, Sr. it was agreed that plaintiff would convey its fee

interest in the real estate to the limited partnership in which the Baileys would be partners and would receive in return an installment promissory note in the principal sum of $1,932,000 secured by a second mortgage on the real estate. This Note[4] is the instrument on which plaintiff's claim against Bailey, Jr. is based.

### 2. Security for the Promissory Note

The parties dispute the nature of the security which was agreed upon for VIP Center's Note. At trial, defendant sought to establish that one of the terms agreed to at the New York meeting was that none of VIP Center's partners, general or limited, would be personally liable on the Note. Freed and Bailey, Sr. testified that the parties did not intend that there would be any personal liability on the Note.

Haberman, plaintiff's president, testified on redirect examination that the terms of the deal that the parties agreed to on December 27 in New York were: (1) that Bankers Trust agree to restructure its first mortgage to cure the default and change the payments; (2) "that Plaza take[ ] its [existing] long-term lease [arrangement with VIP Center] and, in effect, change[ ] that for a mortgage and a note *taking as security the land only*"; and (3) that Plaza give its assistance to Bailey to refinance the deal eventually. Tr. at 91 (emphasis supplied).

Hertan, plaintiff's secretary, testified that he didn't know whether plaintiff intended to hold any of the partners personally liable on the Note; that he could not testify that there was no intent at the time of the closing to hold them liable. Tr. at 64–67. The Court inquired of Hertan who plaintiff presumed would be liable on the Note when it considered the proposed transaction. Hertan stated that the question never came up of "whether a specific individual was or was not to be held, other than Mr. Ginger,[5] other than that, everyone follows his own legal liability." Tr. at 64.

With respect to plaintiff's security for the Note, the Court asked Hertan whether plaintiff was looking to the mortgage, thinking that, on foreclosure, "[w]e have the property." Hertan replied: "Not solely, because in that connection we were well aware there was a very sizeable first mortgage on in front of us. We were not looking to a default in the transaction." Tr. at 65–66.

### 3. Bailey, Jr.'s Involvement as of December 27

Also in dispute was Bailey, Jr's involvement in the transaction as of December 27. At trial, Bailey, Jr. sought to establish that he could not be personally liable on the Note, since neither plaintiff nor the proposed new investors—the Baileys Sr. or their agent Freed—contemplated that Bailey, Jr. would be a principal in the transaction when the terms were agreed to on December 27 in New York.

---

4. The Note provides in pertinent part:

"FOR VALUE RECEIVED, VIP CENTER, an Indiana limited partnership, . . . promises to pay to the order of PEASE & ELLIMAN REALTY TRUST . . . the principal sum of One Million, Nine Hundred Thirty-Two Thousand ($1,932,000.00) Dollars . . .

"All payments of principal and interest are to be made at 919 Third Avenue, New York, New York, unless OBLIGOR is otherwise notified by the holder of this Note. This Note has been duly authorized and issued by OBLIGOR and is secured by a purchase money mortgage ("Mortgage") of even date herewith which encumbers real estate in Marion County, Indiana. No reference herein to the Mortgage and no provision of this Note or of any security securing this Note, shall be deemed to alter or impair the obligation of the OBLIGOR, which is absolute and unconditional, to pay the principal and interest rate herein prescribed . . ..

\* \* \* \* \* \*

"This Note and the Mortgage created as security for the payment of the indebtedness evidenced by this Note are made with reference and shall be construed in accordance with the laws of the State of Indiana.

Executed and delivered at Indianapolis, Indiana, this 30th day of December, 1974."

5. As part of this transaction, Ginger was granted a general release from any liability to plaintiff. Ginger requested the release, in part, because he feared that he might still be liable to plaintiff on his guarantee of VIP Center's land-lease arrangement with plaintiff.

The testimony was conflicting as to whether any participation by Bailey, Jr. was contemplated by the parties on December 27. Hertan testified on direct examination that at that meeting

"[T]he question was raised by me as to who would take Envicon's place in the partnership because Envicon was originally to be the general partner in the limited partnership together with Mr. Ginger.

\* \* \* \* \* \*

"Mr. Freed indicated to me that Guy B. Bailey, Jr. would be the general partner with Ginger and his parents, Mr. & Mrs. Bailey, Sr. [ ] would be the limited partners." Tr. at 17–18, 249.

The testimony of Haberman and Freed, however, establishes that on December 27 Freed did not represent to Hertan and Haberman that Bailey, Jr. would be a general partner of VIP Center. Haberman testified on cross-examination that he did not even find out that Bailey, Jr. was a general partner of VIP Center until after the closing on December 31, Tr. at 86, although Haberman did testify that he assumed that the Baileys would name a new general partner to replace Ginger and that he, Haberman, assumed that anyone the Baileys chose would be financially solid. Tr. at 88–89.

Freed testified that there was no discussion whatsoever of Bailey, Jr.'s becoming a partner of the limited partnership at the December 27, 1974 meeting. Tr. at 208, 218, 221. He testified that the only time that Bailey, Jr.'s name came up at that meeting was when Freed stated to Haberman and Hertan that he would not have come up to New York from Florida for a client other than his law partner's father. Tr. at 221. Freed testified on cross-examination that the subject of who would replace Envicon as general partner of VIP Center never came up at the meeting in New York. Tr. at 224.

All three men agreed that at the December 27 meeting no inquiries were made with respect to Bailey, Jr.'s credit standing. Hertan testified that Haberman had con-

ducted the credit investigation. Haberman testified that he never made any inquiry as to the creditworthiness of Bailey, Jr. However, he had inquired as to the financial standing of the Bailey family. When he first found out who Envicon's client was, in early December 1974, he called Bankers Trust and said: "The gentleman is Guy Bailey, it is the Bailey family, and can you find out as to their credit worthiness of the investing group in Florida?". Tr. at 76. Haberman thought that the Bailey family referred to "whoever—you know, Guy Bailey Sr., his wife, his children, whoever would be the investing group." Tr. at 77.

At the December 27th meeting, the parties decided that the closing would take place in Indianapolis, where the project was located, on December 30 and 31. It was decided that Freed and Hertan would prepare the closing documents and that Haberman would conduct the negotiations with Bankers Trust for the modification of the terms of the first mortgage, although Freed participated in these negotiations to some extent from Florida. Tr. at 219–20, 227–29.

### D. Bailey, Jr. Agrees to Become Managing General Partner

Freed and Bailey, Sr. testified that in Florida on December 30, they decided that Ginger would be unacceptable as the sole general partner of VIP Center and that they would ask Bailey, Jr. whether he would consent to become a general partner of VIP Center. As a general partner, Bailey, Jr. would receive 1% of VIP Center's tax deduction for the year 1974. On that day, Bailey, Jr. agreed to become a general partner and to invest in the limited partnership $11,000 which was advanced to him by his parents. On December 30, Bailey, Jr. executed a power of attorney to enable Charles L. Whistler ("Whistler"), an Indiana attorney who already represented VIP Center and Ginger, to act as Bailey, Jr.'s attorney-in-fact (authorized to sign documents on his behalf) at the closing.

### 1. The Closing

The closing commenced in Indiana on December 30. Hertan attended on behalf of

plaintiff; Freed acted as the Baileys' attorney from Florida and Whistler acted as the Baileys' attorney-in-fact, having been authorized to execute the closing documents on their behalf. Three-way communication among the interested parties, Bankers Trust in New York, Whistler and Hertan in Indiana, and Freed in Florida, was carried on by way of Xerox telecopier.

The timing of the closing was largely determined by tax considerations since the Baileys were buying into VIP Center primarily to obtain a large tax deduction for the year 1974. In order to achieve this goal, the entire transaction had to be completed by December 31, 1974. The substantial tax savings could only be achieved if: (1) the Baileys became partners in the existing partnership, VIP Center, before the end of the year; and (2) the partnership owned the real estate and the improvements that comprised the project during the year 1974. Consequently prior to January 1, 1975, the real estate owned by plaintiff had to be transferred to VIP Center, the assignment of the leasehold from VIP Center to plaintiff had to be cancelled, and the Baileys had to become members of VIP Center. Also, because the Clerk's Office in Indiana was to close at noon on December 31, the parties would have to complete the closing and record the documents with the Clerk before noon on that day.

2. Order of Execution

The Note at issue was signed by Ginger as general partner of VIP Center on December 30, 1974. Most of the other documents were also executed by the parties on December 30. At the end of that day, the documents were not exchanged but were retained by the parties until all of the documents were exchanged on December 31, 1974. Although the testimony on this point is not crystal clear, it seems that the documents were exchanged after the Amendment to the Limited Partnership Agreement (the "Amendment") was signed.

The timing of the execution of the Amendment is a key issue in this case, since it was this document which admitted Bailey, Jr. as the managing general partner, and Mr. and Mrs. Bailey, Sr. as limited partners of VIP Center. Not surprisingly, the parties disagree on when the Amendment became effective.

The Amendment was prepared by Freed in Florida and telecopied to Indiana. The text of the Amendment provided that it was to be effective as of December 30, 1974. Amendment at p. 19. Whistler testified that on December 31, after all of the other documents were executed, he called Freed in Florida, recited everything that had transpired up to that point, and requested Freed's permission to sign the Amendment on behalf of the Baileys. Freed gave his permission and the Amendment was executed. Thereafter, all of the documents were recorded. The Amendment was the last document to be recorded, as indicated by the document number it was assigned.

Whistler, an Indiana attorney, testified that pursuant to Section IC–23–4–2–25 of the Indiana Limited Partnership Act, IC–23–4–2 *et seq.* (the "Limited Partnership Act"), which provides that a certificate of limited partnership is amended when the amendment to the certificate is filed with the office of the county recorder, Bailey, Jr. did not become the managing general partner of VIP Center until the Amendment was recorded—which was after the Note was delivered to plaintiff. Thus Bailey, Jr. was not a partner of VIP Center when the debt was incurred. Since an incoming partner is not personally liable for partnership debts incurred prior to his admission to an existing partnership, Indiana Uniform Partnership Act (the "Uniform Partnership Act"), IC–23–4–1–17[50–417], Bailey, Jr. would be liable on the Note made by VIP Center only to the extent of his interest in the partnership property.

Whistler also opined that Bailey, Jr. could not have been a general partner of VIP Center when the Note was delivered to plaintiff because the Note was signed by Ginger as general partner of VIP Center. Under the provisions of the Amendment, after Bailey, Jr. became the managing general partner of VIP Center, Ginger no longer had authority to act for the partnership.

Hertan testified that he was not aware that Freed gave Whistler instructions with respect to the order of recording the documents. In addition, Hertan testified that the transaction was made up of a series of integrated and interdependent agreements involving plaintiff, the Baileys, Bankers Trust and Ginger and, accordingly, all of the documents were delivered at one time.

Finally, there is no credible evidence to establish that Bailey, Jr. engaged in any activities as a general partner of VIP Center prior to the time that the Amendment was recorded. The testimony of Bailey, Jr. and Freed establishes that Bailey, Jr.'s first act as managing general partner of VIP Center was to endorse to Bankers Trust the promissory notes that Mr. and Mrs. Bailey, Sr. made to the limited partnership, and that this occurred on the afternoon of December 31, after the Amendment was recorded. Hertan's testimony that he overheard a telephone conversation in which someone stated that the promissory notes endorsed by Bailey, Jr. as managing general partner of VIP Center were delivered to Bankers Trust before noon on December 31 is unconvincing.

### The Contentions of the Parties

Plaintiff contends that pursuant to its terms the Amendment became effective on December 30, 1974; that Bailey, Jr. was a general partner of VIP Center when the Note was delivered to plaintiff on December 31, 1974; and that, as a general partner, Bailey, Jr. is personally liable on the Note.

Defendant argues that he is not personally liable on the Note because (1) he became a partner after the Note was delivered; (2) the Note was a pre-existing obligation of VIP Center when he was admitted; and (3) the Note is invalid if Ginger signed it while Bailey, Jr. was VIP Center's managing general partner. Bailey, Jr. contends that if he is liable on the Note, it is as a result of a

mutual mistake by the parties and, accordingly, the Court should reform the Note. Defendant also contends that he is not subject to jurisdiction in New York. Should the Court lack personal jurisdiction over Bailey, Jr., plaintiff's suit must be dismissed, and so that issue is addressed first.

### Personal Jurisdiction

Defendant contends that this Court lacks personal jurisdiction over him under Section 302(a)(1) of the C.P.L.R. because (1) he never personally appeared in New York with respect to the transaction at issue; and (2) he never appeared in New York through an agent. Bailey, Jr. alleges that he did not become a principal in the real estate transaction until after Freed had concluded the negotiations with plaintiff in New York and had returned to Florida. Bailey, Jr. argues that plaintiff is seeking "to obtain jurisdiction over a nondomiciliary merely because the nondomiciliary subsequently becomes a partner of an Indiana Limited Partnership which owes an obligation in New York," Defendant's Letter Brief of May 14, 1979, at p. 7, and that New York's long-arm statute does not extend that far.

Plaintiff argues [6] that the following contacts by Bailey, Jr. with New York are sufficient to satisfy the transaction-of-business requirement of Section 302(a)(1): that the Note is made payable in New York; that Bailey, Jr. adopted and ratified the negotiations conducted in New York; and that Bailey, Jr., acting through Freed, communicated with New York by telephone with respect to this transaction. Furthermore, plaintiff argues that the second requirement of Section 302(a)(1), that the cause of action arise from the transaction of business within this state, is satisfied since this suit on the Note arises out of the real estate deal that was negotiated in New York.[7] For the reasons that follow, the

---

6. Plaintiff has the burden of establishing, by a preponderance of the evidence, that defendant's person is properly before this Court. *United States v. Montreal Trust Co.*, 358 F.2d 239, 242 n.4 (2d Cir.), *cert. denied*, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966); *Hutton v. Piepgras*, 451 F.Supp. 205, 207 (S.D.N.Y.

1978); *Pneuma-Flo Systems, Inc. v. Universal Machinery Corp.*, 454 F.Supp. 858, 862 (S.D.N.Y.1978).

7. Plaintiff asserts that since Bailey, Jr. did not move to dismiss the complaint for lack of personal jurisdiction or mention this defense as a

Court concludes that Bailey, Jr. did not engage in purposeful acts in New York and thus is not subject to jurisdiction here.

## A. Legal Standard

Section 302(a)(1) "confers on the courts of this State *in personam* jurisdiction 'over any nondomiciliary * * * who in person or through an agent * * * transacts any business *within* the state' . . . as to causes of action arising from any such transaction." *Ferrante Equipment Co. v. Lasker-Goldman Corp.,* 26 N.Y.2d 280, 309 N.Y.S.2d 913, 916 (1970) (citations omitted; emphasis in original). Although the decisions of the lower New York State courts indicate that physical presence of a defendant or his agent in New York is usually a precondition to the finding of personal jurisdiction under Section 302(a)(1), the New York Court of Appeals has explicitly ruled to the contrary: "It is important to emphasize that one need not be physically present in order to be subject to the jurisdiction of our courts under CPLR 302 for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in the State." *Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 340 (1970).[8] However, in order to sustain jurisdiction "there must be some transaction attributable to the one sought to be held which occurs in New York." *Ferrante Equipment Co., supra,* 309 N.Y.S.2d at 917.

"The proper inquiry [under Section 302(a)(1)] . . . is 'whether looking at "the totality of the defendant's activities within the forum," purposeful acts have been performed in New York by the [nondomiciliary] in relation to the contract, "albeit preliminary or subsequent to its execution." ' " *Sterling National Bank & Trust Co. v. Fidelity Mortgage Investors,* 510 F.2d 870, 873 (2d Cir. 1975) (citations omitted).

## B. Bailey, Jr.'s Contacts with New York

### 1. Site of payment on the Note

Plaintiff argues that jurisdiction over Bailey, Jr. exists in New York because the Note provides that payment on the Note is to be made here. Although the fact that the Note is payable in New York is a factor to be considered in determining whether this Court has jurisdiction over Bailey, Jr., *China Union Lines, Ltd. v.*

---

ground for a directed verdict at trial, he has waived the defense. Rule 12(h)(1), F.R.Civ.P., provides that a defense of lack of jurisdiction over the person is waived if that defense is neither raised by motion nor included in a responsive pleading. Bailey, Jr. raised a lack of personal jurisdiction defense in his answer. This action was commenced by service of a summons and motion for summary judgment pursuant to Section 3213 of the C.P.L.R., see text at note 1, *supra,* rather than by service of a summons and complaint. In his Petition for Removal and in his response to plaintiff's motion for summary judgment, Bailey, Jr. did raise the defense. When the Court denied plaintiff's motion for summary judgment against Bailey, Jr., plaintiff's motion was deemed a "complaint" and defendant's opposing papers, wherein he asserted a lack of personal jurisdiction defense, were deemed an "answer." See note 1, *supra.* See generally Siegel, Practice Commentaries, McKinney's Consolidated Laws of New York, Book 7B, C3213:11, at 837 (1970). The decisions cited by plaintiff for the proposition that Bailey, Jr. has waived the defense are inapposite. In those cases, unlike in the case at bar, the defendants failed to raise the defense by preanswer motion or in their answer. See, *e. g., Grammenos v. Lemos,* 457 F.2d 1067 (2d Cir. 1972). In *Alger v. Hayes,* 452 F.2d 841 (8th Cir. 1972), although the defendant had asserted a lack of personal jurisdiction defense in his answer, the court found that he waived that defense *on the record* just prior to the commencement of the trial.

8. In *Parke-Bernet,* defendant submitted bids by telephone from California to an auction taking place in New York with the aid of plaintiff's employee in New York, who kept the defendant informed on the bidding and relayed defendant's bids to the auctioneer. The New York Court of Appeals held that defendant, by his "definite and substantial personal involvement" in the auction in New York had transacted business in New York, either personally by "projecting himself in the auction room in order to compete with other prospective purchasers who were there" or through the presence of defendant's agent—plaintiff's employee who assisted defendant during the auction—in New York.

*American Marine Underwriters,*[9] 454 F.Supp. 198, 202 (S.D.N.Y.1978), the mere designation of New York as the site for payment on a promissory note is insufficient to confer jurisdiction over a nonresident defendant. *Bankers Commercial Corp. v. Alto, Inc.,* 30 A.D.2d 517, 289 N.Y.S.2d 993 (App.Div.1968); *Hubbard, Westervelt & Mottlelay, Inc. v. Harsh Building Co.,* 28 A.D.2d 295, 284 N.Y.S.2d 879 (1967). See *National American Corp. v. Federal Republic of Nigeria,* 425 F.Supp. 1365 (S.D.N.Y. 1977). But see *G. Benedict Corp. v. Epstein,* 47 Misc.2d 316, 262 N.Y.S.2d 726 (Sup. Ct.1965), criticized in *Hubbard, Westervelt & Mottlelay, supra,* and cited with apparent approval in *Parke-Bernet, supra.* In *Sterling National Bank & Trust Co., supra,* a promissory note payable in New York to a New York bank was prepared and executed by the defendant, an unincorporated business trust, in Florida. The court did not take issue with the defendant's argument that the mere fact that the loan was payable in New York did not render the non-domiciliary borrower amenable to suit on the loan in New York, but found that the defendant's additional acts in New York, taken together with the fact that the loan was payable in New York, constituted the transaction of business in New York. First, the New York bank had not sent the proceeds of the loan to the defendant in Florida but had credited the funds to the trust's account with the plaintiff bank and then, at the defendant's direction, had transferred the funds to another New York bank. Second, the agreement between the parties required the trust to maintain a minimum balance with the plaintiff bank. Third, on one occasion a representative of the trust had visited the New York bank, though no negotiations between the parties took place during that visit.

**2. Telephone communications**

■ *Sterling* teaches that a nonresident payor on a promissory note made payable in New York must have engaged in additional activities in New York to be subject to jurisdiction here in an action on the promissory note. Plaintiff points to the fact that telephone calls were made between New York and Florida after Bailey, Jr. agreed to become a principal in this real estate transaction as further activities by Bailey, Jr. in New York. After Freed returned to Florida, he did communicate with representatives of Bankers Trust who were located in New York with respect to proposed modifications of the terms of the first mortgage. In addition to the telephonic communication between New York and Florida, Freed and Whistler, who acted as Bailey, Jr.'s attorney-in-fact during the closing, were allegedly in communication with New York by Xerox telecopier during the closing. However, interstate negotiations by telephone do not subject the communicants to the jurisdiction of the courts in the other states involved; nor do negotiations conducted by mail between a New York plaintiff and a nonresident defendant. *Sayles Biltmore, Inc. v. Soft-Fab Textile Processors,* 440 F.Supp. 1010, 1013 (S.D.N.Y.1977), and cases cited therein. Moreover, plaintiff has not stated which documents, if any, were transmitted by Xerox telecopier to New York after December 30.

**3. Transaction of business through an agent: ratification**

■ Plaintiff contends that Bailey, Jr. has transacted business in New York through an agent: plaintiff alleges that when Bailey, Jr. joined the real estate

**9.** In *China Union Lines, Ltd. v. American Marine Underwriters,* the court held that it had jurisdiction under Section 302(a)(1) over two Canadian corporations which had entered into a contract with a New York company even though the Canadian corporations' agents had never entered New York with respect to the transaction. The contract required that payments be made in New York and there was constant telephonic and written communication between the Canadian corporations and the New York company during both the negotiation and performance stages of the transaction. However, even if the holding in *China Union Line, Ltd.* is consistent with the decisions of the New York State courts, see discussion in text *infra,* the facts in that case are distinguishable from those found in the instant case, where there was no "constant" communication between Florida and New York.

transaction on December 30, with knowledge of the transactions's strong New York ties, he adopted and ratified Freed's negotiations in New York on behalf of Mr. and Mrs. Bailey, Sr. Defendant argues that the negotiations that were conducted by Freed [10] in New York cannot be attributed to him because those negotiations were concluded prior to the time that he became a principal in the transaction; that at the time of the December 27 meeting in New York, Bailey, Jr.'s only connection to the transaction was as a law partner of Freed's [11] and as a son of Bailey, Sr., ties insufficient to bind him to Freed's activities in New York.

■ Under Section 302(a)(1) of the C.P.L.R., the activities of a nonresident defendant's agent in New York can provide a basis for jurisdiction over the nonresident in a suit by a third party against the nonresident which arises out of the agent's activities in New York. In determining whether Freed, when he negotiated with plaintiff's representatives in New York, acted as Bailey, Jr.'s "agent" under Section 302(a)(1), the formal trappings of agency law are not as important as the realities of the factual situation, *Louis Marx & Co., Inc. v. Fuji Seiko Co., Ltd.,* 453 F.Supp. 385, 390 (S.D.N. Y.1978); an individual will be deemed an agent of a nonresident defendant if that individual appeared in New York for the benefit of and with the knowledge and consent of the defendant. See *Galgay v. Bulletin Company, Inc.,* 504 F.2d 1062, 1065 & n.1 (2d Cir. 1974); *Elman v. Belson,* 32 A.D.2d 422, 302 N.Y.S.2d 961 (1969).

■ In this case, the testimony clearly establishes that Freed was negotiating only on behalf of Mr. and Mrs. Bailey, Sr. when he appeared in New York on December 27. Bailey, Jr. did testify that he was aware of and interested in what was transpiring in New York prior to the time he became a principal in the transaction. However, this would be insufficient to deem Freed Bailey, Jr.'s "agent" on December 27. Plaintiff's contention that Bailey, Jr. adopted and ratified Freed's negotiations in New York when he joined in the deal on December 30 cannot be upheld. Plaintiff has not cited and this Court has not found any decisions in which the New York courts have attributed to a nonresident defendant the activities of an individual in New York who was not the nonresident defendant's agent at the time that the New York-based activities were engaged in.

■ Furthermore, plaintiff's contention that Bailey, Jr. should be subject to the jurisdiction of this Court because he derived benefit, *i. e.,* a tax saving, from the real estate transaction which was negotiated in New York is not supported here. In *Ferrante Equipment Co. v. Lasker-Goldman Corp., supra,* the New York Court of Appeals rejected the argument that Section 302(a)(1) is met by the circumstance that the nondomiciliary may derive "commercial benefit" from a contract performed by others in New York: "The mere receipt by a nonresident of benefit or profit from a con-

---

**10.** Bailey, Jr. argues that Freed could not be his "agent" for purposes of Section 302(a)(1) in any event because Freed, as a lawyer, is not an "agent" but an "independent contractor," citing *Winick v. Jackson,* 49 Misc.2d 1009, 268 N.Y.S.2d 768 (Sup.Ct.1966). Where the suit is by the agent against his principal, as in *Winick* where the plaintiff was a lawyer who sued his nondomiciliary client, the activities of the agent in New York will not be attributed to the defendant to provide a basis for jurisdiction over the nondomiciliary in New York. Where the suit is by a third-party, and the actions of the defendant's attorney in New York are the basis for jurisdiction over the defendant in New York, whether the actions of defendant's lawyer in New York can be attributed to defendant under Section 302(a)(1) of the C.P.L.R. does not turn on whether defendant's lawyer is a "true agent" or an "independent contractor" but whether the individual who appeared in New York acted for the benefit of and with the knowledge and consent of the defendant. See *Galgay v. Bulletin Company, Inc.,* 504 F.2d 1062, 1065 & n.1 (2d Cir. 1974); *Elman v. Belson,* 32 A.D.2d 422, 302 N.Y.S.2d 961 (1969).

**11.** The partnership relationship between Freed and Bailey, Jr. does not justify a conclusion that Freed's actions in New York were the equivalent for purposes of Section 302(a)(1), of acts by Bailey, Jr. here. See *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1976).

tract performed by others in New York is clearly not an act by the recipient in this State sufficient to confer jurisdiction under our long-arm Statute." *Id.* 309 N.Y.S.2d at 917–18. By the same token, Bailey, Jr. is not subject to jurisdiction in this state merely because he received a profit from a transaction which was negotiated in New York prior to the time that he became involved therein.

In the first, and most important, of a series of decisions discussing the notion of due process as it relates to *in personam* jurisdiction over nonresident defendants, *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the United States Supreme Court declared that "[d]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contracts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" The Supreme Court explained that there is no simple mechanical or quantitative test to be applied in determining whether a defendant's contacts with the forum state are sufficient to render him liable to suit in that state. "Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties or relations." *Id.* at 319, 66 S.Ct. at 160. In *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), the Supreme Court added that to satisfy the "minimum contact" requirement, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

A review of the contacts that Bailey, Jr. has had with this state indicates that the maintenance of a suit against Bailey, Jr. in New York would not comport with notions of fundamental fairness. Bailey, Jr. never personally appeared in New York; Freed, when he appeared in New York, was not acting as Bailey, Jr.'s agent. The other contacts that Bailey, Jr. has had with this forum—that he became general partner of a limited partnership which owed an obligation to a New York-based trust, and that after the time he decided to take part in the transaction telephone calls were made from Florida to New York by someone else acting on behalf of the principals of the transaction—are insufficient to constitute the purposeful activity of Bailey, Jr. in New York that is required by the due process clause of the United States Constitution and New York's long-arm statute. Accordingly, plaintiff's action against Bailey, Jr. must be dismissed for lack of personal jurisdiction.

In reviewing the parties' contentions with respect to the issue of personal jurisdiction, the Court has refamiliarized itself with the facts underlying this suit and with the testimony that was adduced at the trial. The Court therefore deems it appropriate to make findings of fact and conclusions of law on the merits of plaintiff's claim at this time, while the Court still recalls with accuracy the testimony and the demeanor of the witnesses so that, should a reviewing court determine that this Court has jurisdiction over Bailey, Jr., a remand to the district court for a determination on the merits of plaintiff's claim against Bailey, Jr. will not be required. Incorporating the Court's findings of fact and conclusions of law in this opinion and order will avoid the unnecessary duplication of judicial effort.

*Conflict of Laws*

The Court determines that the law of Indiana should be applied in considering the merits of this action. The Note recites that it shall be governed by Indiana law. New York conflict of laws rules, applied by this Court pursuant to the mandate of *Klaxon Co. v. Stentor Electric Manufactur-*

*ing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), gives great deference to such an expression of intent in the contract itself. *CBS, Inc. v. Tucker,* 412 F.Supp. 1222, 1226 n.5 (S.D.N.Y.1976). Furthermore, Indiana has had numerous significant contacts with the transaction at issue: the Note was made by an Indiana limited partnership; it is secured by Indiana real estate; and the documents were executed, delivered and recorded in that state. However, as the Second Circuit noted in *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 451 n.3 (2d Cir. 1977), "in cases of this type, which depend so much on their particular facts and for which direct precedent is therefore so sparse, virtually all jurisdictions would be expected to follow general common law principles."

*Bailey, Jr.'s liability as a General Partner*

It will be recalled that the sequence of events with respect to the Note is as follows: On December 30, Ginger signed the Note on behalf of VIP Center. On December 31, the Note was delivered to plaintiff, the Amendment was signed, and, lastly, the Amendment was filed with the county clerk. The issue to be resolved is whether the Amendment designating Bailey, Jr. as managing general partner and Mr. and Mrs. Bailey, Sr. as limited partners of VIP Center took effect on December 30, as provided in the Amendment, or upon its filing.

Bailey, Jr. contends that he did not become a general partner of VIP Center until the Amendment was filed, relying on Section IC–23–4–2–25 of the Limited Partnership Act which provides:

"(1) The writing to amend a certificate [of limited partnership] shall  .  .  .
(b) Be signed and sworn to by all members  .   .  . .

\*     \*     \*     \*     \*     \*

(5) A certificate is amended or canceled when there is filed for record in the office of the county recorder of the county where the principal place of business of the partnership is located
(a) a writing in accordance with the provisions of paragraph (1)  .   .  . ."

Bailey, Jr. further contends that since the obligation on the Note arose prior to the time that he became a general partner, he is liable on the Note only to the extent of his interest in the partnership pursuant to Section 23–4–1–17[50–417] of the Uniform Partnership Act, which provides:

"A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when such obligations were incurred except that his liability shall be satisfied only out of partnership property."

Plaintiff contends that Bailey, Jr. became a general partner of VIP Center on December 30, when he orally agreed to join the limited partnership; that the Amendment confirms this since it states that it is effective as of December 30; and, accordingly, that he is personally liable on the Note since it was delivered to plaintiff at a time when Bailey, Jr. was already a general partner of VIP Center. Furthermore, plaintiff argues that Section IC–23–4–1–17[50–417] is inapplicable on these facts because Bailey, Jr. was not admitted to an "existing partnership"; that in reality a new partnership was formed when the Baileys invested in VIP Center because prior to that time VIP Center was an empty shell, having no remaining assets.

#### 1.  The Filing Requirement

■  The Court concludes that Bailey, Jr. did not become a general partner of VIP Center until the Amendment was recorded.

Limited partnerships afford a means of investing capital in a partnership without incurring the unlimited liability of a general partner; only a limited partner's investment in the partnership is put in peril. In order to obtain the benefits of limited partnership, in those states, including Indiana, where the Uniform Limited Partnership Act has been adopted, a partnership must comply with the registration requirements of the Act. A major purpose of the statutory scheme is to provide third persons with

notice that they are dealing with a limited partnership.

The execution of a certificate prescribed by the statute is a precondition to the formation of a limited partnership. The statute provides that the persons desiring to form a limited partnership shall sign and acknowledge a certificate containing specified information and file that certificate in the office of the county clerk, and that a limited partnership is formed if there is substantial compliance with these requirements. The statute also provides that the certificate must be amended when, *inter alia,* additional limited or general partners are admitted to the limited partnership. The amendment must be signed by the present members and by the members being added. The original certificate is amended when the amendment "is filed."

█ The statutory language is vague as to whether the existence of the partnership commences at the time the partnership agreement is made or at the time the certificate is filed. *Franklin v. Rigg,* 143 Ga. App. 60, 237 S.E.2d 526 (1977). The proposed new Limited Partnership Act, which was approved by the National Conference of Commissioners on Uniform State Laws in 1976 but has not yet been adopted by the states, expressly states that a limited partnership is formed at the time of filing of the certificate of limited partnership. The cases which explore the question of when a limited partnership commences have been concerned with whether a limited partner becomes liable as a general partner when a certificate of limited partnership is never filed or untimely filed. See, *e. g., Peerless Mills, Inc. v. American Telephone & Telegraph Co.,* 527 F.2d 445 (2d Cir. 1975); *Ruth v. Crane,* 392 F.Supp. 724 (E.D.Pa.1975). The relevant factors to be examined in determining whether an individual partner who intended to become only a limited partner should be deemed a general partner because of the limited partnership's delay in filing the certificate appear to be (1) the length of time between the signing of the agreement and the filing of the certificate and (2) whether the third party had actual

notice of the terms of the limited partnership agreement. See *Franklin v. Rigg, supra.* Since we are concerned here with the question of when a timely filed amendment making Bailey, Jr. a general partner became effective, rather than whether a limited partner lost his limited liability because a certificate was not timely filed, the rules developed in the cases involving the latter situation are not particularly helpful in resolving the matter at hand.

Whistler, the Indiana attorney who acted as the Baileys' attorney-in-fact at the closing, testified that the practice in Indiana with respect to transactions of this type is that when a general partner is to be admitted to an existing partnership at the same time that the partnership is incurring a new obligation, and the new general partner is not to be personally liable on that debt, the documents respecting the new obligation are executed prior to the time that the amendment to the certificate of limited partnership is executed and the amendment is recorded after the other documents are recorded in the county clerk's office, as was done here.

The Court has found only one case in which the issue to be resolved was whether an amendment to the certificate became effective at the time the agreement to change the membership of the limited partnership was entered into or at the time the certificate was filed: *Harry David Zutz Insurance, Inc. v. H.M.S. Associates, Ltd.,* 360 A.2d 160 (Del.Super.Ct.1976). However, the facts of that case are significantly different from those in the case at bar. In *Harry David,* plaintiff sued the limited partnership as well as some of its partners. The limited partnership defendant moved to dismiss the complaint on the ground that it had not been properly served because the individual named in the complaint as the limited partnership's general partner, and on whom process was served, was no longer its general partner at the date of service. The defendant limited partnership alleged that prior to the date of service, the members of the limited partnership had agreed that the general partner (the individual

who was served), would become only a limited partner and a new general partner was appointed. The amendment to the certificate reflecting these changes was not filed until after the disputed service of process was made. The defendant argued that the agreement substituting a new general partner was effective when it was made, i. e., before service of process. The court found that service was properly made on the limited partnership's general partner and stated that the language of the statute "makes it clear that the original . . . certificate is not deemed amended until the amendment has been properly filed." Id. at 163.

This Court agrees that the language of the statute clearly states that the amendment is effective when it is filed. Where, as here, the amendment was timely filed and the individual named as a general partner in the amendment did not engage in any activities on behalf of the partnership prior to the time the amendment was filed, there is no reason for holding that the amendment became effective at an earlier date. This case is easily distinguishable from decisions wherein partners who engaged in acts for the partnership after a limited partnership agreement was signed were held liable as general partners, even though a limited partnership certificate was never filed.

■ Plaintiff's argument that the Baileys became partners on December 30 by oral agreement is erroneous for two reasons: first, at that time the conditions for their participation had not yet been met; second, there is no evidence to establish that at that time Ginger, who was a general partner of VIP Center and, accordingly, would have to consent to the Baileys' admission, was even aware of the events in Florida. Plaintiff's argument that the

agreement by its own terms is made effective as of December 30 fails to take account of the further statutory requirement that an amendment to the certificate be filed.[12]

■ Finally, plaintiff argues that it should not be prejudiced because the Baileys, without plaintiff's knowledge, chose to file the Amendment after all the other documents were recorded. However, there can be no prejudice to plaintiff by the delayed recording since plaintiff did not rely on Bailey, Jr.'s participation in the transaction when it decided to convey the real estate in consideration for the Note. Plaintiff received all the consideration it bargained for: Mr. and Mrs. Bailey, Sr. joined the partnership which made the Note and they transferred $1,100,000 in cash and notes to VIP Center.[13]

## 2. Liability of an incoming partner

Plaintiff contends that Section IC–23–4–1–17[50–417], which states that an incoming partner to an existing partnership is liable on a preexisting obligation of the partnership only to the extent of his interest in the partnership, is inapplicable in this case (1) because Bailey, Jr. did not become a member of an existing partnership; and (2) because the Note was not a preexisting obligation of VIP Center when Bailey, Jr. was admitted as a general partner.

■ The Court rejects plaintiff's first argument that "the change in [VIP Center's assets and investors] in a real and practical sense created a new business entity." Plaintiff's Main Brief at 15. VIP Center was an existing partnership when Bailey, Jr. became its managing general partner. Although there was a real change in management on December 31, the nature of VIP Center's business—the operation of the project—remained exactly as before.

---

12. For the same reasons, the Court rejects plaintiff's argument that Bailey, Jr. must have been a general partner before the Amendment was signed because pursuant to the terms of the Amendment it is the responsibility of the managing general partner (who, according to plaintiff's interpretation of the Amendment and the law, must therefore be in office), to file the Amendment.

13. For the same reason, the Court is not persuaded by plaintiff's argument that Bailey, Jr. joined the partnership when the Note was delivered because the obligations of the parties to each other were concurrent.

Plaintiff's argument is especially weak in light of the fact that both parties knew that the continuity of the limited partnership entity had to be maintained if the Baileys were going to receive a tax benefit from the transaction and it is precisely for that reason that Ginger was retained as a general partner of VIP Center.

■ The Court also rejects plaintiff's contention that the Note was not a preexisting obligation of VIP Center when Bailey, Jr. was admitted because the obligation "arose" not when the Note was executed and delivered, but when the first payment was due in July of 1977. Plaintiff relies on *Barbro Realty Co. v. Newburger,* 53 A.D.2d 34, 385 N.Y.S.2d 68 (1976), wherein the court held that rent as a debt "arose" when it became due, not when the lease was signed, but plaintiff has cited no cases which have extended this principle to payments made on promissory notes.

Finally, the Court rejects plaintiff's contention that Bailey, Jr. ratified the transaction after he joined VIP Center and is thus liable on the Note. Although an incoming partner who expressly or impliedly adopts a partnership obligation incurred prior to his admission to the partnership is liable thereon, see *Hoffman v. Stewart,* 184 Ill.App. 66 (1913); *Lucas v. Coulter,* 104 Ind. 81, 3 N.E. 622 (1885), plaintiff has not established that Bailey, Jr., either by his words or his actions, adopted the obligation. This Court declines to hold that Bailey, Jr. adopted the obligation merely because he derived some benefit from the transaction. Indeed, to so hold would expose an incoming partner to liability for all preexisting debts of the partnership while the Uniform Partnership Act specifically protects incoming partners precisely from such liability.

The Court finds that Bailey, Jr. became a member of an existing partnership after the Note was delivered, that the Note was a preexisting debt and, accordingly, that Bailey, Jr. is liable on the Note only to the extent of his partnership interest in VIP Center.

*Reformation*

■ As I have said, if this Court has jurisdiction over Bailey, Jr. it would hold that he is not liable on the Note as a matter of law. If the law were otherwise, the Court would reform the Note so as to include a clause exculpating Bailey, Jr. from personal liability.

1. The Law

In *Pearson v. Winfield,* 160 Ind.App. 613, 313 N.E.2d 95, 98–99 (1974), the court explained that

"In Indiana, equity has jurisdiction to reform written documents in only two well defined situations:

(1) Where there is a mutual mistake, that is, where there has been a meeting of the minds, an agreement actually entered into, but the contract, deed, settlement, or other document, in its written form does not express what was really intended by the parties thereto; and

(2) where there had been a mistake of one party, accompanied by fraud or inequitable conduct by the remaining parties.

*Citizens National Bank of Attica v. Judy, et al.* (1896), 146 Ind. 322, 43 N.E. 259.

"The present case arises under the first of these situations—a mutual mistake of fact. The court in *Citizens National Bank of Attica v. Judy, et al., supra,* commented on the propriety of a grant of reformation for a mutual mistake:

'. . . it is only possible for a written contract to be reformed, when the parties have actually made a contract which is different in its terms from the contract which had been reduced to writing . . . There can be no rectification, however, unless it is proved that both parties were mistaken in the use of the terms to be corrected, and that both parties agreed to the contract sought to be substituted for that to be set aside. In each term of the contract to be thus set up, it must be proved that the parties concurred. To a contract, concurrence of minds is essential, and no substitution of an amended con-

tract can be made without showing that the parties concurred in the amended contract.

The same court continued:

'Therefore, to authorize a reformation, the misunderstanding must have been mutual; and a rectification will only be permitted where both parties have executed the instrument under a common mistake, and have done what neither of them intended. In every case it must clearly and satisfactorily appear that the precise terms of the contract had been orally agreed upon, and that the writing afterwards signed fails to be, as it was intended, an execution of such previous agreement, but, on the contrary, expresses a different contract, and that this is the result of mutual mistake.'

"A party seeking reformation on the ground of mutual mistake must establish by clear and satisfactory proof the true intentions common to all parties to the instrument, that a mistake was made, and that the mistake was mutual and consequently the instrument, as written, does not state the true intention or agreement of the parties.

"The primary purpose of reformation is to effectuate the common intentions of all parties to an instrument which were incorrectly reduced to writing. It follows that a grant of reformation is necessarily predicated upon a prior understanding between all parties on all essential terms. Otherwise, there would be no standard to which an instrument could be reformed."

Defendant cites *Adams v. Wheeler,* 122 Ind. 251, 23 N.E. 760 (1890), as directly on point. In that case, Adams purchased real estate subject to a mortgage held by Wheeler. It was uncontroverted that Adams never agreed to assume the debt to Wheeler but by mistake, and without the knowledge of the parties, a scrivener included a stipulation that Adams would assume the debt in

the deed. The Indiana Supreme Court reformed the deed:

"The facts alleged present a highly meritorious case for the reformation of a deed. Upon what principle should a debt of $6,000 be imposed upon the appellant, and made his personal obligation, when it is admitted that he merely purchased the property subject to the mortgage, and that there was no agreement between the parties to the deed that he should assume or pay the debt. . . ." *Id.*

██ *Adams* is not on "all fours" with the instant case since Wheeler sought to hold Adams liable pursuant to a specific clause in the deed which, it was conceded, erroneously stated that Adams assumed the mortgage. In contrast, Plaza seeks to hold Bailey, Jr. liable by operation of law, by virtue of his alleged status as a general partner of the obligor. *Adams* does stand for the proposition that where it is proved that the parties agreed that only the property would stand behind the promissory note and it was not agreed that the personal assets of the purchaser of the property would be available to satisfy the debt, if the debt instrument does not reflect this intention of the parties, it should be reformed.

### 2. The Facts

Defendant alleges that the parties agreed that only the real estate and not the personal assets of VIP Center's members, would secure the Note. Plaintiff argues that there is no evidence, let alone clear and convincing evidence, which establishes that it did not intend to hold Bailey, Jr. personally liable since it is agreed that the parties never discussed Bailey, Jr.'s liability on the Note.[14] However, the question to be resolved is not whether the parties agreed that Bailey, Jr. would not be liable on the Note (since, as plaintiff points out this was never discussed and in any event Bailey, Jr.'s liability is not alleged to rest on his personal undertaking but on his status as a

---

14. Plaintiff alleges that testimony concerning the alleged mistake was inadmissible because it varied the terms of the written agreement. The parol evidence rule does not apply in actions to reform written instruments for mutual mistake. See generally 13 Williston on Contracts § 1552 (3d Ed. 1970).

general partner who is unlimitedly liable for the obligations of the partnership), but whether the parties agreed that *no member* of VIP Center would be personally liable on the Note.

The testimony establishes that the parties each intended that only the property would secure the Note. Of great significance is Haberman's testimony that the deal that he and Bailey, Sr. agreed to was that Plaza would exchange its existing long-term lease with VIP Center for a mortgage and a note *taking as security the land only*. Neither party intended or expected that the personal assets of any member of the investing group would stand behind the Note. The testimony of Haberman, Freed, and Bailey, Sr. establish that the consideration flowing to plaintiff was the Note to be secured by the real estate, and the infusion of over one million dollars into VIP Center by Mr. and Mrs. Bailey, Sr. The resulting benefit to plaintiff from this transfer of funds to VIP Center would be to save plaintiff's equity interest in the property and in the leasehold which would probably have been extinguished had the default on the first mortgage held by Bankers Trust not been cured.

Plaintiff's point, that the term "security" (in Haberman's statement at trial that the only "security" was to be the land) does not include the personal liability of a general partner, is not without merit. See generally Restatement of the Law: Security (A.L. I.1941) (Security is an interest in chattels or land). However, more important than the technical meaning of the term "security" is Haberman's failure to clarify or explain his statement, after being given several opportunities to do so and while knowing full well, as an attorney and as plaintiff's president, that defendant might benefit from his, Haberman's, testimony at trial. Nonetheless, Haberman was consistent in his response to the questions from both plaintiff's and defendant's attorneys—the land was the only security for the Note.

The Court gives little weight to Hertan's testimony that he did not know whether there was an intention on plaintiff's part to hold anyone personally liable, for several reasons. First, the answer expresses nothing but lack of knowledge. Second, Hertan's memory of the details of the transaction was shown to be not nearly as accurate as Freed's or Haberman's. Hertan's recollection of when and where the negotiations in New York took place and what was said differs from Haberman's and Haberman's recollection is in line with Freed's. Third, although Hertan drafted the Note, Haberman was much more involved in negotiating the terms of the transaction than was Hertan. Haberman knew who Envicon's clients were prior to the time Hertan was informed of their identity. And after the unsuccessful meeting between Envicon and Freed, it was Haberman who called Florida to discuss the terms of a transaction with the Baileys. Also, Haberman is plaintiff's president; Hertan is its secretary and a member of the law firm which represents plaintiff in this suit.

Further corroboration for defendant's position that the parties never intended that the investors would be personally liable on the Note is the lack of interest plaintiff's officers showed on December 27 as to who, if anyone, would become a general partner of VIP Center and whether such an individual would be financially responsible.

The evidence establishes, by clear and satisfactory proof, that the agreement made on December 27 was that only the land and not the personal assets of the members of the investing group, would stand behind the Note. Since the Note does not reflect the parties' intent, were Bailey, Jr. to be liable thereon the Court would grant reformation and would add to the Note a clause exculpating Bailey, Jr. from personal liability.

*Conclusion*

The complaint is hereby dismissed for lack of jurisdiction over defendant Bailey, Jr. Should this Court have jurisdiction over Bailey, Jr., it concludes that he was liable on the Note only to the extent of his interest in the partnership property.

SO ORDERED.